Evangeline **CAYTON**, M.D., Appellant

v.

Patricia **MOORE**, Appellee.

No. 05–06–00490–CV.

Court of Appeals of Texas, Dallas.

Jan. 24, 2007.

Jennifer T. Shuff, and Michael A. Yanof, Stinnett, Thiebaud & Remington, L.L.P., Dallas, for Appellant.

Stephen Goetzmann, Law Offices of Stephen R. Goetzmann, and D. Bowen Berry, Berry & Randall, L.L.P., Dallas, for Appellee.

Before Justices MOSELEY, FRANCIS, and LANG.

## OPINION

Opinion By Justice LANG.

In this interlocutory appeal, Evangeline Cayton, M.D., appeals the trial court's order denying her motion to dismiss, pursuant to section 74.351(b) of the Texas Civil Practice and Remedies Code, Patricia Moore's claims alleging medical malpractice. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (Vernon Supp.2006).

Dr. Cayton raises two issues arguing the trial court abused its discretion when it denied her motion to dismiss. She contends the trial court erred because the expert report: (1) does not establish the expert is qualified to render standard of care opinions; and (2) fails to address the applicable standard of care and a causal relationship between the alleged breaches of the standard of care and the injuries claimed.

Moore filed a motion to dismiss this appeal arguing this interlocutory appeal is not permitted by the applicable statute, section 51.014(a)(9) Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon Supp.2006).

We conclude this Court has jurisdiction over this interlocutory appeal. Moore's motion to dismiss the appeal is denied. Also, we conclude the trial court abused its discretion when it determined the expert report was adequate and denied Dr. Cayton's motion to dismiss because the expert report fails to adequately address the causal relationship between Dr. Cayton's alleged breach of the standard of care and Moore's claimed injury, harm, or damages. The trial court's order denying Dr. Cayton's motion to dismiss is reversed and this case is remanded to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 9, 2003, Moore went to the emergency department of the Baylor University Medical Center because she was experiencing weakness on her left side, loss of sensation, and was not able to support herself. At the emergency department, Waleed Hamed El–Feky, M.D., a neurologist, examined and evaluated Moore. Dr. El–Feky interpreted a CT scan of Moore's head and a chest X-ray as normal. However, Dr. El–Feky found evidence of radiculopathy. As a result, he referred Moore to Dr. Cayton, a physiatrist,[1] recommending a cervical magnetic

---

1. A physiatrist is a physician specializing in physiatry or physical medicine and rehabilitation. *See* American Academy of Physical Medicine and Rehabilitation (AAPM & R), http://www.aapmr.org/condtreat/specback. htm. Physical medicine and rehabilitation is the branch of medicine emphasizing the prevention, diagnosis, and treatment of disorders that may produce temporary or permanent impairment. *Id.* Physical medicine and rehabilitation provides integrated care in the treatment of all neurologic and musculoskeletal

resonance imaging (MRI) study. Four days later, on May 13, 2003, Moore saw Dr. Cayton. After examining Moore, Dr. Cayton diagnosed left upper and lower extremity weakness, and neck pain with spasms. Dr. Cayton ordered a cervical and a brain MRI to look for central nervous system problems as soon as possible. Also, she ordered an electromyographic (EMG) study to look for peripheral nervous system problems to take place in a few weeks. On May 17, 2003, five days after Moore was examined by Dr. Cayton, the cervical and brain MRIs were performed. The brain MRI was normal, but the cervical MRI revealed a disc herniation between the C3 and C4 vertebral bodies, severe central canal stenosis, and cord compression at the C4–5 and C5–6 vertebral bodies. The radiologist notified Dr. Cayton of the results of the MRIs. On May 19, 2003, two days after Moore's MRI, Ben Scott, M.D., a neurosurgeon, admitted Moore to the hospital. He observed that Moore was only able to shrug her left shoulder and diagnosed her with Brown–Sequard Syndrome. Moore was treated with steroids to decrease spinal cord swelling for two days and then, Dr. Scott performed surgery, an anterior cervical disectomy at C3–4 with interbody fusion.

On July 25, 2005, Moore sued Dr. Cayton, Dr. El–Feky, and Baylor University Medical Center for medical malpractice. On August 22, 2005, Dr. Cayton filed an answer generally denying Moore's allegations. On November 17, 2005, Moore filed the expert report of Lorne Sheldon Label, M.D., a neurologist,[2] along with his curric-

ulum vitae, in order to comply with section 74.351 of the Texas Civil Practice and Remedies Code. On December 8, 2005, Dr. Cayton filed a motion to dismiss Moore's claims on the basis that Dr. Label's report was inadequate because he was not qualified and the report did not address how Dr. Cayton caused Moore's injuries. On February 1, 2006, Moore filed an amended response arguing that Dr. Label was qualified and his report did establish causation. However, Moore did not request, in the alternative, a 30–day extension in which to cure any deficiencies in the report. After a hearing, the trial court denied Dr. Cayton's motion.[3] Dr. Cayton appealed.

## II. JURISDICTION

Moore filed a motion to dismiss arguing Dr. Cayton's interlocutory appeal was filed improperly pursuant to section 51.014(a)(9) of the Texas Civil Practice and Remedies Code. It is Moore's contention that section 51.014(a)(9) applies only when the trial court denies a motion to dismiss under section 74.351(b) because no expert report was actually served. Because Moore actually filed Dr. Label's report, Moore contends that Dr. Cayton's interlocutory appeal would be proper only under section 51.014(a)(10), which applies when an expert report was filed and the trial court granted the motion to dismiss on the basis that the expert report was inadequate pursuant to section 74.351(l). Dr Cayton responds that this Court has jurisdiction pursuant to section 51.014(a)(9) because: (1) section 51.014(a)(9) expressly provides

disabilities from traumatic brain injury to lower back pain. *Id.* Physiatrists often serve as the leader of an interdisciplinary team. *Id.* That team may include medical professionals such as neurologists. *Id.* The team is different for each patient and the team's composition changes during treatment to match the patient's shifting needs. *Id.*

**2.** A neurologist is a physician skilled in the diagnosis and treatment of disease of the nervous system. *See Ehrlich v. Miles,* 144 S.W.3d 620, 625 (Tex.App.-Fort Worth 2004, pet. denied).

**3.** The record on appeal does not contain a reporter's record.

for appeal from the denial of relief requested pursuant to section 74.351(b); and (2) her motion to dismiss, which she filed pursuant to section 74.351(b), applies both when a report is inadequate and when no report is filed.

Section 51.014(a) establishes when an interlocutory appeal may be taken from a trial court's orders relating to section 74.351. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a); *Lewis v. Funderburk,* 191 S.W.3d 756, 759 (Tex.App.-Waco 2006, pet. filed). A person may appeal from an interlocutory order issued pursuant to section 74.351 when the trial court: (1) denies the relief sought under section 74.351(b); or (2) grants the relief sought under section 74.351(*l*). *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9), (10); *Heart Hosp. of Austin v. Matthews,* 212 S.W.3d 331, 333–34 (Tex.App.-Austin, 2006, no pet. h.); *Lewis,* 191 S.W.3d at 760; *Mokkala v. Mead,* 178 S.W.3d 66, 67 n. 1 (Tex.App.-Houston [14th Dist.] 2005, pet. filed).

In her motion to dismiss, Dr. Cayton argued the expert report was inadequate under section 74.351(*l*) and Moore's failure to file an adequate expert report is grounds for mandatory dismissal of all her claims under section 74.351(b). Moore responded that Dr. Label's report was adequate and prayed for the trial court to deny Dr. Cayton's motion.

■ Because the trial court's order denies, in part, Dr. Cayton's motion to dismiss under section 74.351(b), we conclude this Court has jurisdiction over Dr. Cayton's interlocutory appeal under section 51.014(a)(9).

## III. ADEQUACY OF EXPERT REPORT

In her first and second issues, Dr. Cayton argues the trial court abused its discretion when it denied her motion to dismiss, determining the expert report

constituted an objective good faith effort to comply with the requirements of an expert report, because the expert report and curriculum vitae: (1) do not establish Dr. Label is qualified to render standard of care opinions; and (2) fails to address the applicable standard of care and a causal relationship between the alleged breaches of the standard of care and the injuries claimed. We address the second issue, which is dispositive of this appeal and decide in Cayton's favor. We need not address the first issue and we express no opinion on its merits.

### A. Standard of Review

■ An appellate court reviews a trial court's decision on a motion to dismiss a claim under section 74.351 of the Texas Civil Practice and Remedies Code for an abuse of discretion. *See Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006) (per curiam) (discussing former article 4590i); *Am. Transitional Care Ctrs. of Tex. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (discussing former article 4590i). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (discussing section 74.351) (citing *see Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999)). When reviewing matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *See Gray,* 189 S.W.3d at 858 (citing *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992)). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would under similar circumstances. *See Gray,* 189 S.W.3d at 858 (citing *see Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42

(Tex.1985)). However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker*, 827 S.W.2d at 840. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *See id.*

### B. Applicable Law

■ An expert report must provide enough information to fulfill two purposes if it is to constitute an objective good faith effort. *See Palacios*, 46 S.W.3d at 878–79; *Gray*, 189 S.W.3d at 859. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *See Palacios*, 46 S.W.3d at 879; *Gray*, 189 S.W.3d at 859. Second, the report must provide a basis for the trial court to conclude the claims have merit. *See Palacios*, 46 S.W.3d at 879; *Gray*, 189 S.W.3d at 859.

■ An expert report must provide a fair summary of the expert's opinions as of the date of the report regarding: (1) the applicable standards of care; (2) the manner in which the care rendered by the physician failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). If a report omits any of the statutory elements, it cannot be a good faith effort. *Eichelberger v. Mulvehill*, 198 S.W.3d 487, 489 (Tex. App.-Dallas 2006, pet. denied).

■ A report cannot merely state the expert's conclusions as to the standard of care, breach, and causation. *See Palacios*, 46 S.W.3d at 879; *Hansen v. Starr*, 123 S.W.3d 13, 20 (Tex.App.-Dallas 2003, pet. denied); *Garcia v. Marichalar*, 198 S.W.3d 250, 254 (Tex.App.-San Antonio 2006, no pet.); Gray, 189 S.W.3d at 859. The expert must explain the basis for his statements and must link his conclusions

to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002); *Garcia*, 198 S.W.3d at 254; *Gray*, 189 S.W.3d at 859. A trial court may not draw any inferences. *See Palacios*, 46 S.W.3d at 879; *Gray*, 189 S.W.3d at 859. Instead, the trial court must rely exclusively on the information contained within the four corners of the report. *See Palacios*, 46 S.W.3d at 879; *Gray*, 189 S.W.3d at 859. However, the expert report does not need to marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See Ehrlich v. Miles*, 144 S.W.3d 620, 626 (Tex.App.-Fort Worth 2004, pet. denied). The expert report may be informal and the information presented need not meet the same requirements as evidence offered in summary judgment proceedings or in a trial. *See id.* Also, it is the substance of the opinions, not the technical words used, that constitutes compliance with the statute. *See id.* at 626–27.

### C. Application of the Law to the Facts

In her second issue, Dr. Cayton argues the expert report does not constitute an objective good faith effort to comply with chapter 74 because it fails to adequately address: (1) the applicable standard of care and the alleged breach; and (2) the causal relationship between Dr. Cayton's alleged breach of the standard of care and Moore's alleged injuries. She argues the expert report contains only conclusory, general statements regarding the standard of care applicable to Moore and the alleged breach, and it does not articulate what care was expected, but not given. Moore responds that Dr. Label's report states the standard of care, how Dr. Cayton breached that standard of care, and the causal relationship.

In her claims against Dr. Cayton for medical malpractice, Moore alleged, on

May 13, 2003, Dr. Cayton noted Moore needed a cervical MRI as soon as possible, but failed to schedule the MRI until May 17, 2003, five days later. Also, Moore alleged Dr. Cayton failed to immediately hospitalize Moore when she first examined Moore on May 17, 2003. In addition, Moore alleged Dr. Cayton failed to immediately communicate the results of the cervical MRI on May 17, 2003, and hospitalize Moore, instead waiting until May 19, 2003, two days later, to inform Moore of the results and hospitalize her.

Dr. Label's report states the following with regard to the standard of care for a patient experiencing Moore's symptoms:

> The standard of care for a patient who changes from a normal strong person to someone who is developing hemiparesis and new significant neck pain is to rule out an acute pathologic process in the cervical region. Admittedly, one cannot find fault in ruling out a stroke in the brain despite the lack of facial sensation or motor abnormalities and the degree of neck pain. However, once brain stroke was ruled out in the E.R. the standard of care is to provide work-up and care with an extensive work-up as quickly as possible. The purpose would be to treat those conditions that would be amenable to treatment. In cases such as this where a herniated disc is causing acute compression and swelling with impairment of the spinal cord nervous system, it is known that the sooner that removal of the disc to decompress the area occurs, the more likely weakness and sensory changes could return to some level of prior function or even to normal.

Dr. Label's report addresses the conduct of Moore's primary care physician, Dr. El–Feky, and Dr. Cayton. The report contains only one standard of care and does not specifically state that the same standard of care applies to all three physicians. However, before outlining the standard of care, Dr. Label does state in his report that "The Brown–Sequard Syndrome is an unusual, but well-known entity particularly to neurologists, neurosurgeons, and physiatrists."

Dr. Label's report specifically refers to Dr. Cayton and discusses how she breached the standard of care outlined in his report.[4] It discusses what care was expected, i.e., rapid treatment and diagnosis,

4. With respect to Dr. Cayton's breach of the standard of care, Dr. Label's report states:

Dr. Cayton, a physiatrist, fell below the standard of care by not immediately evaluating and treating Ms. Moore on May 13, 2003, the first day that she was seen by Dr. Cayton. Her evaluation comments on this 45–year–old woman who had been walking until two weeks previous when she developed a stiff neck and began losing her strength arriving in a wheelchair and finding that the patient had 50% loss of strength on the left yet did not take immediate action as a physiatrist trained in central and peripheral nervous system abnormalities. Furthermore, her examination as a physiatrist is lacking by the incomplete sensory examination (only testing for sharp sensation) and not testing her gait, particularly since she arrived in a wheelchair. "Due to time pressure, they came late in the afternoon. I was not able to stand her up to see if she could walk, as she was wheelchair bound." She fell below the standard of care not by lack of diagnostic acumen by recognizing a Brown Sequard Syndrome, but rather, not taking action on a previously healthy middle aged woman who suddenly could not walk and was half paralyzed with new neck pain and did not have evidence of a brain stroke. The pathology would have to be in the cervical area and the need for treatment rapid. It is not clear who arranged the cervical MRI study, the patient or the physician's staff. However, it was not done until four days later implying a non-communication by the physician with the radiologist as to the urgency of the needed tests. Appropriate treatment would have been immediate hospitalization. Dr. Cayton was not considering an acute problem, as her additional treatment recommen-

and immediate hospitalization. Further, Dr. Label says this care was not given because of repeated delays in conducting diagnostic tests and admitting Moore to the hospital.

■ The portion of Dr. Label's report that addresses causation does not mention Dr. Cayton.[5] In fact, Dr. Label states that if Moore would have had surgery "within a day or so" of her medical evaluation at Baylor University Hospital, she would have suffered mild to no permanent injury. However, Moore's initial visit to Dr. Cayton did not occur until four days after she was evaluated at Baylor University Hospital. Accordingly, we conclude the trial court abused its discretion to the extent it determined that Dr. Label's expert report constituted an objective good faith effort to comply with chapter 74 because it fails to adequately address the causal relationship between Dr. Cayton's alleged breach of the applicable standard of care and Moore's claimed injury, harm, or damages. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

Dr. Cayton's second issue is decided in her favor.

## IV. CONCLUSION

This Court has jurisdiction over Dr. Cayton's interlocutory appeal because the

---

dations included aquatic therapy for a few weeks, as well as an EMG in a few weeks. An EMG would only be helpful in cases of a peripheral nervous system problem not a central nervous system problem, which was Ms. Moore's pathology. Dr. Cayton again fell below the standard of care by another delay after receiving information by the radiologist. She should immediately have called the patient and admitted her to the hospital or called the neurologist to take care of the situation. It was not until two days later that Ms. Moore was seen by Dr. Scott, the neurosurgeon, admitted to the hospital and ultimately treated.

5. Dr. Label's report states the following regarding the causal relationship between Dr. Cayton's failure and Moore's injury, harm, or damages:

The mechanism of injury was related to direct compression of the disc towards the spinal cord, in this case at the C3–4 level with an underlying condition of cervical spinal cord stenosis, which may have been partially congenital in nature. This slowly progressive problem was not causing any medical problems and, in particular, no known neurological difficulties. It was not until her cervical disc began to herniate in late April causing gradual compression of her cervical spinal cord and ultimately the functions of those particular nerve pathways descending and ascending in the spinal cord that neurological damage appeared. In this case, the pattern of damage due to compressing disc was a Brown–Sequard Syndrome....

The issue of how these deviations from the standard of care caused [Ms. Moore's] injuries is a straightforward one. The condition of spinal cord compression by a slowly compressing herniated disc against a soft spinal cord are well-known, as well as what losses occur with damage to the non regenerating [sic] spinal cord. It is known that trauma or significant pressure once affecting the motor and sensory tracts within the spinal cord usually do not regenerate or perform normally once the damage ensues. These cases are often considered neurosurgical emergencies. Once neurological impairment begins, the long term neurologic functional losses are those which present up until the time of surgical correction. So if Ms. Moore would have had her cervical disc removed within a day or so of her medical evaluation at Baylor University Hospital, she would have been left with a mild left hemiparesis or be normal. Less than a week later she was completely paralyzed on the left side and had other neurological abnormalities. The analogy would be when one firmly compresses a straw with enough pressure the indentations may remain permanently. This situation occurs with spinal cord compression. In fact, if her primary care physician would have worked her up or referred her to a specialist, it is unlikely that she would have had any neurological impairment prior to removal of her herniated disc.

trial court's order denies, in part, Dr. Cayton's motion to dismiss under section 74.351(b).

Moore's motion to dismiss this interlocutory appeal is **DENIED.**

The trial court abused it discretion to the extent it determined that Dr. Label's expert report constituted an objective good faith effort to comply with chapter 74 because it fails to adequately address the causal relationship between the standard of care and the alleged breach.

The trial court's order denying Dr. Cayton's motion to dismiss Moore's claims is **REVERSED** and the case is **REMANDED** to the trial court for further proceedings consistent with this opinion.