**BAYLOR MEDICAL CENTER AT WAXAHACHIE and BAYLOR HEALTH CARE SYSTEM d/b/a Baylor Medical Center at Waxahachie, Appellants**

v.

**Richard WALLACE and Debbie Wallace, Appellees.**

No. 05–08–00714–CV.

Court of Appeals of Texas, Dallas.

March 6, 2009.

James M. Stewart, Stewart & Stimmell, L.L.P., Dallas, TX, for Appellant.

Charles M. Noteboom, J. Mark Sudderth, The Noteboom Law Firm, Hurst, TX, for Appellee.

Before Justices WRIGHT, O'NEILL, and LANG.

## OPINION

Opinion by Justice LANG.

This interlocutory appeal involves a medical malpractice action brought by Richard and Debbie Wallace against Baylor Medical Center at Waxahachie and Baylor Healthcare System d/b/a Baylor Medical Center at Waxahachie (Baylor Medical Center). Baylor Medical Center appeals the trial court's order denying its motion to dismiss, pursuant to section 74.351(b) of the Texas Civil Practice and Remedies Code.

In two issues, Baylor Medical Center argues the trial court erred in denying its objection to the medical expert's report when it: (1) failed to sustain Baylor Medical Center's objection that the medical expert's report was required to address the "standard of care" in emergency medical care provided in section 74.153 of the Texas Civil Practice and Remedies Code; (2)(a) failed to sustain Baylor Medical Center's objection that the medical expert was unqualified to render a report against Baylor Medical Center; and (2)(b) failed to sustain Baylor Medical Center's objection that the medical expert's report was insufficient to satisfy the required statutory element of causation.

We conclude the trial court did not err when it denied Baylor Medical Center's motion to dismiss. The trial court's order is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 20, 2007, the Wallaces filed a medical malpractice lawsuit against Baylor Medical Center. They alleged Richard Wallace went to the emergency department at Baylor Medical Center with signs and symptoms of a cerebral bleed, but the medical personnel failed to properly evaluate, diagnose, and treat him and instead, negligently discharged him. As a result, he went untreated for a week and ultimately sustained severe and permanent brain damage. The Wallaces filed suit and served the required medical expert's report. Baylor Medical Center filed a motion to dismiss challenging the adequacy of the medical expert's report. After a hearing, the trial court denied Baylor Medical Center's motion to dismiss.

## II. MEDICAL EXPERT'S REPORT

In issues one and two, Baylor Medical Center challenges the adequacy of the medical expert's report relating to: (1) the appropriate standard of care; (2) the medical expert's qualifications; and (3) causation.

### A. Standard of Review

Generally, an appellate court reviews a trial judge's decision on a motion to dismiss a claim under section 74.351 of the Texas Civil Practice and Remedies Code for an abuse of discretion. *See, e.g., Baylor Univ. Med. Ctr. v. Rosa,* 240 S.W.3d 565, 569 (Tex.App.-Dallas 2007, pet. denied); *Cayton v. Moore,* 224 S.W.3d 440, 444 (Tex.App.-Dallas 2007, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Cayton,* 224 S.W.3d at 444. A trial court has no discretion when determining what the law is or in applying the law to

the facts. *Id.* at 445. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

### *B. Standard of Care*

■ In issue one, Baylor Medical Center argues the trial court erred when it failed to sustain Baylor Medical Center's objection that the medical expert's report was required to address the "standard of care" in emergency medical care provided in section 74.153 of the Texas Civil Practice and Remedies Code, i.e., willful and wanton negligence. The Wallaces respond that their claims do not arise out of the provision of emergency medical care, but the absence of such care, there is no requirement that the medical expert's report must address whether the defendant's actions were willful and wanton, and the medical expert's report adequately addressed the standard of care.

### 1. Applicable Law

Section 74.153 is titled **"Standard of Proof** in Cases Involving Emergency Medical Care" and provides the claimant must show "by a preponderance of the evidence that the physician or health care provider, with willful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances." TEX. CIV. PRAC. & REM.CODE ANN. § 74.153 (Vernon 2005) (emphasis added).

Section 74.351(r)(6) defines an "expert report" as:

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding the applicable **standards of care,** the manner in which the care rendered by the physician or health care provider failed to meet the standards,

and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp.2008) (emphasis added).

■ The phrases "standard of care" and "standard of proof" are not synonymous in the context of medical malpractice actions. *Bosch v. Wilbarger Gen. Hosp.,* 223 S.W.3d 460, 464 (Tex.App.-Amarillo 2006, pet. denied). Section 74.351(r)(6) requires the expert's medical report to provide a fair summary of the applicable standard of care. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6); *Bosch,* 223 S.W.3d at 464. Section 74.153 does not constitute a standard of care as contemplated by section 74.351(r)(6). *Bosch,* 223 S.W.3d at 464. Instead, it provides the evidentiary standard of proof required in emergency medical care cases. *Id.* In the absence of a stipulation or admission, any expert report asserting the attending physician or health care provider's negligence was willful and wanton could only be based on speculation or *ipse dixit* because section 74.351(s) limits discovery before an expert report is filed. *See id.*

### 2. Application of the Law to the Facts

Baylor Medical Center argues section 74.153 establishes the standard of care required in cases involving emergency medical care. It contends the Amarillo Court of Appeals's decision in *Bosch,* which concluded section 74.153 does not set forth a standard of care as contemplated by section 74.351(r)(6), should be disregarded. *See id.* Instead, Baylor Medical Center urges that, when combined, the rulings in *Murff, Axelrad,* and *Dill* require the conclusion that section 74.153 establishes the standard of care for cases involving emergency medical care, which the Wallaces' medical expert was required to address in

his report. *See Murff v. Pass,* 249 S.W.3d 407, 409 n. 1 (Tex.2008) (per curiam) (proper standard of proof in case involving section 74.153 is preponderance of evidence); *Jackson v. Axelrad,* 221 S.W.3d 650, 655 (Tex.2007) (ordinary care standard is not higher standard of care like strict liability, lower standard of care like gross negligence, and willful and wanton standard for emergency care); *Dill v. Fowler,* 255 S.W.3d 681, 683 (Tex.App.-Eastland 2008, no pet.) (statute imposes lower standard of care when physician provides emergency care in certain settings)

Baylor Medical Center has not cited any case law that directly addresses the issue resolved in *Bosch.* Rather, it pieces together statements in other cases and invites us to weave together a different conclusion than *Bosch.* We decline to do so and instead, agree with the conclusion in *Bosch* that section 74.153 does not constitute a standard of care as contemplated by section 74.351(r)(6). *See Bosch,* 223 S.W.3d at 464. Accordingly, we conclude the trial court did not abuse its discretion when it failed to require the medical expert's report to address section 74.153.

Issue one is decided against Baylor Medical Center.

### C. Medical Expert's Qualifications

■ In the first part of issue two, Baylor Medical Center argues the trial court erred when it failed to sustain Baylor Medical Center's objection that the medical expert was unqualified to render a report against Baylor Medical Center. Baylor argues the medical expert's statements about his qualifications are conclusory and he fails to "disaggregate" the standards of care applicable to nurses, nurse practitioners, physician's assistants, and physicians. Also, it contends that based on this Court's conclusion in *Simonson,* the medical expert is not qualified because he does not state any familiarity with the standards of care applicable to nurses, nurse practitioners, and physician's assistants. We note Baylor Medical Center states although the medical expert's "report and curriculum vitae may arguably establish training, experience, or knowledge of the care expected from an emergency room physician, nothing shows he is familiar with the specific issues to these various speciality health care providers." The Wallaces respond a physician is not disqualified from offering an opinion regarding nursing care and the medical expert's report contains the information missing from the report in *Simonson* by expressly referencing his experience working with nurses, nurse practitioners, and physician's assistants in hospital settings and affirming his familiarity with the standards of care applicable to those types of health care providers.

### 1. Applicable Law

Section 74.401 establishes that, in a suit involving a health care liability claim against a physician, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.401 (Vernon 2005).

Similarly, section 74.402(b) establishes that, in a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of medical care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.402(b).

 Section 74.402(b) makes it clear that different standards of care apply to physicians and health care providers. *See Simonson v. Keppard,* 225 S.W.3d 868, 872 (Tex.App.-Dallas 2007, no pet.). When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. *See id.* at 872–74. However, if the physician states he is familiar with the standard of care for both nurses and physicians, and for the preven-

tion and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. *See San Jacinto Methodist Hosp. v. Bennett,* 256 S.W.3d 806, 814 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (distinguishing *Simonson*). Further, if a physician states he is familiar with the standard of care and responsibilities and requirements for physician's assistants, and he has worked with, interacted with, and supervised physician's assistants, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. *See Cook v. Spears,* 275 S.W.3d 577, 582-84 (Tex.App.-Dallas Dec.19, 2008, no pet.) (distinguishing *Simonson*). A physician is not required to state he is familiar with the core standards contained in the code, establishing the "core standards" for nurse practitioners or physician's assistants. *See id.*

### 2. Application of the Law to the Facts

In his expert report, Stephen P. Busby, M.D., stated his qualifications as an expert witness on the issue of whether the nurses, nurse practitioner, physician's assistant, and physician involved in the claim departed from accepted standards of medical care. In addition to the statements in his report, Dr. Busby's curriculum vitae states he is certified by the American Board of Psychiatry and Neurology, he has practiced general and clinical neurology, and his patient care responsibilities at the University of Texas Medical Branch at Galveston include the evaluation and care management of adult and adolescent neurology patients in the inpatient and outpatient settings and critical care management in the ICU and ER settings with a specific interest in cerebrovascular disease.

In *Simonson*, this Court concluded the trial court abused its discretion when it denied a nurse practitioner's motion to dismiss because "nowhere in his affidavit does [the medical expert] state that he either has knowledge of the standards of care applicable to nurse practitioners or that he has ever worked with or supervised nurse practitioners." *Simonson*, 225 S.W.3d at 872. In contrast, Dr. Busby's expert report includes his specific statement that he has worked with nurses, nurse practitioners, physician's assistants, and physicians, including emergency room physicians, and he is familiar with the standards of care that apply to such health care providers in similar situations. *See Cook*, 275 S.W.3d at 582-84; *Bennett*, 256 S.W.3d at 814. We conclude the trial court did not abuse its discretion when it concluded the medical expert was qualified to render a report against Baylor Medical Center.

The first part of issue two is decided against Baylor Medical Center.

### D. Causation

In the second part of issue two, Baylor Medical Center argues the trial court erred when it failed to sustain Baylor Medical Center's objection that the medical expert's report was insufficient to satisfy the required statutory element of causation. Baylor Medical Center claims the medical expert's report: (1) is conclusory as to treatment opinions and there is a "causal disconnect"; (2) is internally inconsistent; (3) failed to eliminate other possible causes for Richard Wallace's condition; and (4) failed to identify the manner in which each health care provider failed to meet the standard of care. The Wallaces respond that the report is not conclusory because it relied on facts set forth in the report and explained the basis for its conclusions. Also, the Wallaces argue the

medical expert's report is not internally inconsistent, rather it pointed out inconsistencies in the medical records and addressed them. Further, the Wallaces claim Texas law does not require a medical expert's report to specifically identify negligent employees and agents. Instead, it requires the report to be specific enough to give each defendant fair notice of the claims against him.

### 1. Applicable Law

The report by a medical expert must provide a fair summary of the expert's opinion as to each of the statutory elements of: (1) standard of care; (2) breach; and (3) causation. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Greenberg v. Gillen*, 257 S.W.3d 281, 282 (Tex.App.-Dallas 2008, pet. dism'd). A medical expert's report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the physician or health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6); *Harris County Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 180 (Tex. App.-Houston [1st Dist.] 2007, no pet.).

To present an objective good faith effort to comply with these requirements, the report must: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex.2001); *Greenberg*, 257 S.W.3d at 282. A report that merely states the medical expert's conclusions does not fulfill these two purposes. *Palacios*, 46 S.W.3d at 879. Rather, the medical expert must explain the basis for his statements, linking his conclusions to the facts. *See Bowie Mem'l Hosp. v. Wright*, 79

S.W.3d 48, 52 (Tex.2002). However, a plaintiff need not present evidence in the report as if he were actually litigating the merits of his claim. *See Palacios,* 46 S.W.3d at 879. Furthermore, the report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id.*

## 2. Application of the Law to the Facts

The medial expert's report provided a review of the medical records and a summary provided by Debbie Wallace of her recollections. He noted Debbie Wallace's summary and the medical records were consistent. We summarize this review to evaluate whether the medical expert has explained the basis for his statements to link his conclusions to the facts. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52.

The medical expert's review of the records provided that on May 9, 2005, Richard Wallace went to the emergency room at Baylor Medical Center where he was initially evaluated by a physician's assistant. Richard Wallace reported he had neck pain from his head to his shoulders, nausea, vomiting, and on the previous day broke out in a sweat. He also stated his mother had experienced two aneurysms and he was a smoker. Debbie Wallace recalled that the nurse practitioner told her husband "If it were an aneurysm, you would not be standing here. You would probably already be gone." Several blood tests were conducted and his blood pressure was elevated. The physician's assistant discussed the case with the attending physician, who signed the medical chart. Richard Wallace was given medication for his pain and to lower his blood pressure. He was discharged approximately two and a half hours later and the nurse's chart notes his condition had improved. According to Debbie Wallace, her husband never saw the attending physician.

The medical expert's summary continued that the medical records showed six days later, on May 15, 2005, Richard Wallace returned to the emergency room at Baylor Medical Center complaining of neck and back pain. The medical records reflected he had a headache and had been vomiting. After he was seen by the attending physician, Richard Wallace had a CT which led to the diagnosis of a subarachnoid hemorrhage. As a result, he was transferred by ambulance to the Baylor Medical Center in Dallas, where he was admitted. The next day, a cerebral angiogram disclosed a bilobar communicating artery aneurysm with severe vasospasm. Richard Wallace initially responded well to his treatment, but he developed severe complications of vasospasm, had a heart attack, and a subsequent CT scan revealed a stroke. Ultimately, Richard Wallace suffered brain damage, which prevents him from functioning at the level of self-care.

In his report, the medical expert stated that when a patient, without a history of headaches, complains of the sudden onset of a very bad headache, neck pain, and nausea, is determined to have elevated blood pressure, and reports he is a smoker and has a strong family history of cerebral aneurysm, a reasonably prudent nurse practitioner, physician's assistant, and physician should recognize the significant possibility the symptoms are caused by cerebral bleeding. Further, he stated all physicians are taught during clinical training that when a patient complains of "having the worst headache they have ever had" the patient should be considered to have a ruptured aneurysm until an aggressive evaluation proves or disproves that diagnosis.

Additionally, the medical expert stated the very basic standard of accepted prac-

tice and standard of care required the patient to receive appropriate testing, a CT scan and, if normal, a spinal tap. The physician responsible for diagnosing Richard Wallace should have recognized the significant risk of aneurysm and should have ordered such testing. Also, the medical expert stated the nurses and other practitioners should have recognized such risk and ensured the attending physician was fully aware of the situation and symptoms, including the patient's insistence that he receive proper evaluation for a possible cerebral aneurysm. The medical expert stated this is particularly the case when the attending physician does not personally see or evaluate the patient and relies on health care providers to examine, evaluate, and report on the patient's condition. In particular, the medical expert stated it was a clear violation of the standard of care for a nurse to declare that because Richard Wallace was not already dead, he did not have a ruptured aneurysm.

The medical expert concluded that appropriate testing would have revealed the subarachnoid hemorrhage, and Richard Wallace would have been hospitalized and received immediate care, including surgical treatment for the aneurysm and preventive therapy for vasospasm. He stated the most significant harm that typically results from a cerebral aneurysm is not caused by the bleeding, but from strokes resulting from vasospasm. As a result, it was critical to begin treatment early to contain the vasospasm. The medical expert opined that had Richard Wallace been properly diagnosed on May 9, 2005, rather than May 15, 2005, after the bleeding became worse, he would not have experienced significant vasospasm and ultimately severe brain damage.

■ First, Baylor Medical Center argues the medical expert's report is conclu-

sory. However, the medical expert's report identified, in significant detail, the underlying facts and linked his conclusions to those facts. See Bowie Mem'l Hosp., 79 S.W.3d at 52. We conclude the medical expert's report is not conclusory.

Second, Baylor Medical Center argues the medical expert's report does not satisfy the causation element because it is "internally inconsistent." It claims the medical expert stated Richard Wallace was experiencing a hemorrhage or cerebral bleed on May 9, 2005, but identified the cause of Richard Wallace's condition as a stroke. The medical expert's report clearly explained how the failure to diagnose a sentinel bleed and the resulting delay in treatment led directly to Richard Wallace's stroke and brain damage. Specifically, the medical expert opined that if the testing and treatment had been performed on May 9, 2005, in all reasonable medical probability, he would have received preventive therapy for vasospasm and he would not have experienced significant vasospasm and ultimately severe brain damage. See Kettle v. Baylor Med. Ctr. at Garland, 232 S.W.3d 832, 842 (Tex.App.-Dallas 2007, no pet.) (experts' report sufficient as to causation where nurse's delay in reporting to physicians delayed treatment and opined patient's death was not imminent, but preventable by earlier treatment); Garrett, 232 S.W.3d at 181 (expert's report provided fair summary of causal relationship where expert opined breach of standard of care permitted patient's cancer to advance); In re Barker, 110 S.W.3d 486, 491 (Tex. App.-Amarillo 2003, orig. proceeding) (expert report stating negligent failure to recognize medical condition and delay in treatment increased severity of patient's injuries was sufficient), mand. denied, In re Woman's Hosp. of Tex., Inc., 141 S.W.3d 144 (Tex.2004). We conclude the

medical expert's report was sufficient to meet the causation element.

■ Third, Baylor Medical Center argues the medical expert's report failed to eliminate other possible causes for Richard Wallace's condition. In support of this argument, Baylor Medical Center cites *Barko v. Genzel*, 123 S.W.3d 457, 460–61 (Tex.App.-Eastland 2003, no pet.), for the proposition that "Before concluding that a provider's negligence was the cause, the report must eliminate other conditions and causes or else it is conclusory on the issue of causation and insufficient under the statute." In that case, the Eastland Court of Appeals noted the medical experts' reports did not indicate the patient would have satisfactorily recovered from the back injury but for the physician's negligence or that back surgery would have been avoided, and the reports made no attempt to eliminate either the back injury itself or the attempt to surgically repair it as a potential cause of the permanent neurological damage. *Id.* The opinion in *Barko* does not stand for the broad proposition asserted by Baylor Medical Center.

Baylor Medical Center does not cite any legal authority that requires the expert report to specifically address every possible cause for Richard Wallace's condition. Section 74.351(r)(6) requires the medical expert's report to provide a fair summary of the medical expert's opinions regarding the causal relationship between the failure of the physician or health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Garrett*, 232 S.W.3d at 180. Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report

is filed. Further, the Wallaces were not required to present evidence in the medical expert's report as if they were actually litigating the merits of their claim. *See Palacios*, 46 S.W.3d at 879. The report is not required to meet the same evidentiary requirements as in a summary judgment proceeding or at trial. *See id.*

Even though there is no requirement that the medical expert's report express an opinion that eliminates all possible causes for Richard Wallace's condition, the report did so. The medical records showed, on May 9, 2005, Richard Wallace was diagnosed with elevated blood pressure and headache, given medication for his blood pressure and pain, and discharged, the notation having been made in the medical records that his condition had improved. In his report, the medical expert addressed these earlier diagnoses when he stated although elevated blood pressure can cause a headache, that headache usually does not have a sudden onset and a patient's response to pain medication is normal and expected, but that does not imply there is nothing seriously wrong with the patient.

Also, in its motion to dismiss, Baylor Medical Center argued the expert's report failed to exclude, as the cause of the stroke, Richard Wallace's heart attack, blood clot in his lower right extremity, three interventional radiology procedures, and low blood pressure. The medical expert stated the medical records showed that the morning after he was admitted to the hospital, Richard Wallace underwent a cerebral angiogram which disclosed an aneurysm with severe vasospasm. The aneurysm was treated with interventional installation of a coil and the vasospasm was treated. However, he developed severe complications of vasospasm and triple-H therapy was initiated. Richard Wallace underwent balloon angioplasty

treatment of the vasospasm. Also, he developed shortness of breath, was diagnosed with a heart attack, and the triple-H therapy was suspended. He had a pulseless right lower extremity due to a blood clot and underwent a thrombectomy. Thereafter, he remained intermittently on pressor therapy and was again angioplastied to control the vasospasms. By day six of his hospitalization, his vasospasm had "improved somewhat," but his mental status remained impaired. Various blood pressure elevator combinations were attempted to balance his cerebral ischemia and cardiac ischemia, i.e., the insufficient supply of blood to those areas. Despite all of this, a CT scan on day ten of his hospitalization showed an infarct, i.e., a stroke. After reciting the foregoing, the medical expert concluded that in all reasonable medical probability, if Richard Wallace had received appropriate testing and evaluation on May 9, 2005, much of the subsequent harm he experienced would likely have been avoided. We conclude the medical expert's report addressed other possible causes of Richard Wallace's condition, discussed how they were a series of interconnected medical events, and eliminated them as sole possible causes of his stroke.

Finally, Baylor Medical Center argues the medical expert's report failed to identify the manner in which each health care provider failed to meet the standard of care. It claims it is unclear whether a physician's assistant or nurse practitioner was involved and these types of practitioners are different specialties and operate under different protocols. The medical expert's report identified that Debbie Wallace recalled a nurse practitioner initially evaluated her husband and noted it seemed apparent from the medical records of Baylor Medical Center that Richard Wallace was evaluated by a physician's assistant. The medical expert's report identified with particularity what was not done by the various specialties of healthcare professionals and the basis on which each speciality should have addressed the problem. This provided sufficient notice of the conduct the Wallaces have called into question for each specialty of health care provider. We conclude the medical expert's report was sufficient to identify the manner in which each health care provider failed to meet the standard of care.

Accordingly, we conclude the trial court did not abuse its discretion when it determined the medical expert's report was sufficient to satisfy the statutory element of causation. The second part of issue two is decided against Baylor Medical Center.

## III. CONCLUSION

The trial court did not err when it denied Baylor Medical Center's motion to dismiss.

The trial court's order is affirmed.