*Court Of Appeals*
*Fourth Court of Appeals District of Texas*



★ ★ ★        ★ ★ ★

# MEMORANDUM OPINION

No. 04-09-00297-CV

**VHS SAN ANTONIO PARTNERS LLC** d/b/a Southeast Baptist Hospital,
Appellant

v.

Meliso B. **GARCIA**, Individually and as Next Friend for Meliso A. Garcia
and on behalf of Xaviera Garcia,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CI-18550
Honorable Sol Casseb III, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Catherine Stone, Chief Justice
                 Phylis J. Speedlin, Justice
                 Marialyn Barnard, Justice

Delivered and Filed: October 7, 2009

AFFIRMED

      This is an interlocutory appeal from the denial of a motion to dismiss a medical negligence

suit. Appellant VHS San Antonio Partners LLC d/b/a Southeast Baptist Hospital ("Baptist") was

sued after Xaviera Garcia, an obstetrics patient, suffered permanent brain damage at its hospital. In

a single issue, Baptist argues the trial court should have dismissed the suit because the accompanying

expert report was conclusory on the issue of causation and did not constitute a good faith effort to summarize the expert's opinions as required by law. We disagree with Baptist's contention that the expert report was conclusory on causation, and hold that the trial court did not abuse its discretion in denying the motion to dismiss. Accordingly, we affirm the trial court's order.

## BACKGROUND

As a preliminary matter, we note this is an interlocutory appeal filed early in the litigation process. Because the facts have not been established, our review of the trial court's order is based on the facts alleged in the original petition and recited in the accompanying expert report.

Meliso B. Garcia filed a medical negligence suit against Garcia's doctors[1] and Baptist along with an expert report. According to the original petition and the expert report, Garcia was 25 weeks pregnant and experiencing heavy vaginal bleeding when she was admitted to Southeast Baptist Hospital by her obstetrician, Dr. Harmon Kelley. Garcia was placed in a room in the antepartum ward and attended to by Baptist nursing staff. After two days in the hospital, Garcia was determined to be in active labor and, because of concerns about a placental abruption, her baby was delivered by cesarean section. After the delivery, Garcia became hypotensive, tachycardic, and pulseless. A "Code Blue" was called and efforts were made to resuscitate Garcia. Although Garcia was eventually resuscitated, she suffered from severe anoxic[2] encephalopathy.[3]

---

[1] The doctors are not parties to this appeal.

[2] Anoxic is defined as "[p]ertaining to or caused by a general lack of oxygen, and characterized by a generally subnormal oxygen tension of the blood." TABERS CYCLOPEDIC MEDICAL DICTIONARY A-63 (10th ed. 1965).

[3] Encephalopathy is defined as "[a]ny dysfunction of the brain." *Id*. E-21.

The petition in this case alleges the Baptist nursing staff was negligent in failing to adequately monitor the fetus, in failing to adequately assess Garcia's labor, in subjecting Garcia to an inappropriate hospital environment, and in failing to inform Dr. Kelley of the extent of Garcia's bleeding and labor. The seventeen-page expert report was prepared by Dr. Mark D. Akin, who opined that "[i]f Mrs. Garcia had received obstetrical care that met the standards of care, her injuries would have been avoided." Baptist objected to the adequacy of the expert report on the basis that the expert's opinion on proximate cause was "sheer speculation," stating "Dr. Akin [did] not link any action or omission on the part of the hospital and/or its nurses to the outcome in this case." The trial court overruled the objection. Baptist later filed a motion to dismiss the claims against it, contending the expert report was "completely conclusory with regard to causation" and "nothing but pure speculation." The motion to dismiss was denied by the trial court. On appeal, Baptist argues the trial court abused its discretion in denying the motion to dismiss.

### EXPERT REPORT REQUIREMENTS UNDER CHAPTER 74

Under section 74.351(*l*) of the Texas Civil Practice and Remedies Code, "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*) (Vernon Supp. 2008). Under section (r)(6), an expert report means "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."

*Id*. § 74.351(r)(6). To constitute an objective good faith effort, the expert report must fulfill the two-part test articulated by the Texas Supreme Court. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001) (construing former art. 4590i, § 13.01). Under this test, the report must provide enough information to (1) inform the defendant of the specific conduct the plaintiff has called in to question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions about the standard of care, breach, and causation falls short of accomplishing these two purposes. *Id.* However, the report need not marshal all the plaintiff's proof, or meet the requirements for evidence offered at trial or to support a summary judgment. *Id*. at 878-79.

To establish causation, an expert report must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury. *See Hutchinson v. Montemayor,* 144 S.W.3d 614, 617 (Tex. App.—San Antonio 2004, no pet.) (holding expert report did not represent a good faith effort to establish the causation element when the report did not link the purported breach of the standard of care to the plaintiff's injury); *see also Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (holding because the expert report lacked information linking the expert's conclusion to the alleged breach, the trial court could have reasonably determined the report was conclusory).

In evaluating expert reports at this preliminary stage, courts look only to the information provided within the four corners of the report. *Palacios*, 46 S.W.3d at 878. Courts are precluded from filling gaps in the reports by drawing inferences or guessing as to what the expert likely meant or intended. *Walters v. Hudoba*, No. 2-08-196-CV, 2009 WL 161079, at *5 (Tex. App.—Fort Worth

Jan. 22, 2009, no pet.) (citing *Palacios*, 46 S.W.3d at 878). However, section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history. *Id*. And, nothing in section 74.351 requires the expert report to rule out every possible cause of injury, harm, or damages. *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.).

Sometimes, when read in isolation, the causation section of an expert report may appear to be conclusory. *Benavides v. Garcia*, 278 S.W.3d 794, 799 (Tex. App.—San Antonio 2009, pet. denied) (citing *Cooper v. Arizpe*, No. 04-07-00734-CV, 2008 WL 940490, at *2-3 (Tex. App.—San Antonio Apr. 9, 2008, pet. denied)). But courts are entitled to read the causation section of an expert report in the context of the entire report. *Philipp v. McCreedy*, No. 04-08-00922-CV, 2009 WL 2342919, at *7 (Tex. App.—San Antonio July 29, 2009, no pet.); *id*.

### CAUSATION

Here, Baptist argues the expert report is conclusory as to causation and, therefore, does not constitute an objective good faith effort to comply with section 74.351(*l*). We review the trial court's ruling on a motion to dismiss under section 74.351(*l*) for an abuse of discretion. *See Palacios*, 46 S.W.3d at 878. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

"Conclusory" is defined as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." BLACK'S LAW DICTIONARY 308 (8th ed. 2004). Though not in a medical negligence suit, the Texas Supreme Court has indicated that a "conclusory" expert

opinion states "a conclusion without any explanation." *See Arkoma Basin Exploration Co., Inc. v. FMF Assoc. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008) (holding expert's opinions at trial were not conclusory because they did not simply state a conclusion without any explanation, or ask jurors to "take" the expert's "word for it").

Baptist argues Dr. Akin's report is conclusory because it fails to link the alleged negligence of the Baptist nurses (failing to adequately monitor the fetus, failing to adequately assess labor, subjecting Garcia to an "inappropriate environment," and failing to inform Dr. Kelley of the extent of Garcia's bleeding during labor) to the outcome (severe anoxic encephalopathy). We disagree. In the section of his report detailing the specific acts or omissions by Baptist nursing care, Dr. Akin states,

> [t]he standard of care for a hospital and their nurses is to provide appropriate obstetrical care for an antepartum patient, with a level of care that ensures a safe environment for both the patient and her fetus. In this case, Mrs. Garcia had two significant risk factors that were known prior to admission, both heavy vaginal bleeding and a [25 week, 3 day] gestation. It was inappropriate for the nursing staff to allow admission of a patient with these complications to an antepartum room, which is a nursing environment incapable of providing the level of care necessary to evaluate and manage this condition. Mrs. Garcia deserved the benefit of a labor and delivery environment. As a result, Mrs. Garcia was inadequately assessed for labor, and the well-being of her fetus was inadequately assessed.

> Although it is unclear whether Nurses Vaughn or Williams had any role in the initial decision for admission to the antepartum floor, Nurse Williams should have insisted upon transfer to L & D when she discovered Mrs. Garcia's V-pad was saturated at 15:35. This is particularly true in light of the fact that Dr. H. Kelley had been notified of a critical H/H at 14:40, and did not plan to come see his patient when Nurse Williams called him at 15:35. Mrs. Garcia was at significant risk of obstetrical hemorrhage and fetal jeopardy, and should have been transferred to L & D at that time.

> There is no evidence that Nurse Williams contacted her charge nurse concerning the acuity of Mrs. Garcia in the few hours after admission, but this would have been the

appropriate decision. Instead, the patient continued to bleed on the antepartum ward, the fetus was unmonitored, and by 17:35 Nurse Williams administered pain medicine without knowing if she was treating pain caused by uterine fibroid degeneration, preterm labor or placental abruption.

When Nurse Mann assumed care, Dr. H. Kell[e]y had already made a decision for blood transfusion. Nurse Mann should have insisted that the patient be transferred to L & D. Although post partum patients sometimes require blood transfusions on a post partum ward, a [25 week, 3day] pregnancy with significant bleeding and a potentially compromised fetus should not be transfused in an environment that is ill suited to manage sudden bleeding, hypotension, shock, labor, or fetal distress.

Mrs. Garcia continued to have bleeding and abdominal pain throughout her admission until her emergency C-section. Nurses Chris Vaughn, H. Williams, Michelle Mann, D. Marryott, G?, Janni ?, continued to administer pain medication on a regular basis for a crampy[,] tense abdomen without the benefit of maternal monitoring for labor, or fetal monitoring for well-being. The pain medicine, two Lortab tablets, which was relatively strong for a 148 pound female, temporarily reduced her pain, but essentially obscured the fact that Mrs. Garcia was in prodromal labor. Dr. H. Kelley was never notified of the condition of his patient except at the time of his daily rounds, and based upon his progress notes, it appears that he was not acutely aware of how significant Mrs. Garcia's pain was (8 out of 10), or that she was likely in prodromal labor. This was particularly true all day and evening on [the first day of admission], when nurses Janni ? and D. Marryott provided pain medicine for Mrs. Garcia, but never notified Dr. H. Kelley that the pain was 8/10 scale, and constant and tense. Within reasonable probability, Mrs. Garcia's [] placental abruption [was] evolving during this time window. If Mrs. Garcia had been in a labor and delivery environment on this day, the healthcare providers would have had increased awareness of labor, and their ability to provide prevention of preterm labor and/or pre-operative management of her C-section would have been enhanced significantly. Drs. Kelleys were forced to manage an acute emergency in the wee hours of the morning, with no forewarning, when emergency care is more likely to result in complications, as in this case.

Thus, Dr. Akin's expert report explains how, in his opinion, the nursing staff fell below the standard of care by failing to notify Dr. Kelley of the level of Garcia's pain and the nature and extent of Garcia's bleeding, by failing to contact the charge nurse concerning the severity of Garcia's condition, and by failing to insist on Garcia's transfer to the labor and delivery ward. And, as shown

above, Dr. Akin supports his opinions with details and references to the underlying facts. Additionally, Dr. Akin links the nursing staff's alleged breaches of the standard of care—particularly the nursing staff's failures to adequately assess labor, to notify Dr. Kelley of the extent and nature of Garcia's bleeding and pain, and to place Garcia in an appropriate environment—to Garcia's injuries. In the introductory paragraph in the medical opinion section of the report Dr. Akin states,

> It is my professional opinion that Xaviera Garcia presented to Southeast Baptist Hospital with significant vaginal bleeding and massive uterine fibroids, which would be considered a high-risk obstetrical emergency. Subsequent physician and nursing management fell below the standards of care for assessment and management of obstetrical hemorrhage, blood loss and preterm labor. *When Mrs. Garcia's labor began, a cesarean section was performed without an adequate assessment of her recent blood loss and hemodynamic status. As a consequence, she became so severely anemic and volume depleted during her C-section, that after receiving medication in the recovery room she could not sustain a blood pressure. During the cardiopulminary resuscitation, her brain was without oxygen for an extended period of time, resulting in permanent brain damage. If Mrs. Garcia had received obstetrical care that met the standards of care, her injuries would have been avoided.*

(emphasis added).

> Later, in the conclusion of the report, Dr. Akin states,

> Nurses Chris Vaughn, H. Williams, Michelle Mann, D. Marryott, G?, and Janni ?, as employees at Southeast Baptist Hospital, also had a duty to provide reasonable obstetrical care to Mrs. Xaviera Garcia. They subjected Ms. Garcia to an inappropriate hospital environment by allowing her to remain on an antepartum floor, which did not allow an adequate assessment of her obstetrical conditions. These nurses did not adequately inform [] Dr. H. Kelley of the extent of prodromal labor and bleeding that was occurring, and *this proximately contributed to the subsequent complications that ensued. But for these nursing failures, Ms. Garcia would have, in all reasonable medical probability, delivered her baby without sustaining a serious neurologic injury.*

(emphasis added). After reviewing Dr. Akin's report as a whole, we conclude the trial court could have reasonably determined the report represents a good-faith effort to summarize the causal relationship between the nursing staff's breaches of the standard of care and the injury claimed.

Additionally, Baptist argues that because of the alleged conclusory nature of Dr. Akin's report, this court must indulge in several impermissible inferences to uphold the trial court's ruling. In making this argument, Baptist focuses on isolated statements contained in the report, asserting these statements require this court to make inferences that Garcia's injuries would not have occurred had the nursing staff properly assessed Garcia and informed Dr. Kelley of the extent of Garcia's labor and bleeding. We disagree. Courts are entitled to read the causation sections of the expert report in the context of the entire report. *Benavides*, 278 S.W.3d at 799; *Philipp*, 2009 WL 2342919, at *7. And, after doing so, we are of the opinion that the causation sections of Dr. Akin's report do not require us to make inferences or to guess as to what the expert likely meant on the issue of causation.

Next, Baptist argues Dr. Akin's report is conclusory on causation because it does not address what might have happened if the nurses had not breached the standard of care. According to Baptist, even if Garcia had been admitted to the labor and delivery ward and even if the nurses had informed Dr. Kelley of the extent of Garcia's labor and bleeding, the same injuries might have occurred. But the fact that the expert report does not address these hypothetical situations does not necessarily render it conclusory on causation. Although the law requires the expert report to link the expert's conclusion on causation with the alleged breach of the standard of care, nothing in section 74.351 requires the expert report to address or rule out all other possible scenarios. *See Wallace*, 278 S.W.3d

at 562 (pointing out that section 74.351 does not require the expert report to specifically address every possible cause for the plaintiff's injury).

Baptist also contends the expert report is conclusory on causation because it does not show that the breaches of the standard of care by the nursing staff were a substantial factor in causing Garcia's brain injuries. Again, we disagree. At this preliminary stage in the litigation, "a plaintiff need not present evidence in the expert report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879.

Finally, to support its arguments, Baptist cites *Jones v. King*, a case in which this court held the trial court abused its discretion when it denied the defendants' motion to dismiss under section 74.351. 255 S.W.3d 156, 160 (Tex. App.—San Antonio 2008, pet. denied). In *King*, we determined the expert report contained "little more than a series of repetitious conclusory statements" and "wholly fail[ed] to explain how these alleged breaches caused the injuries alleged." *Id*. at 159. Accordingly, we concluded the expert report did not provide the trial court sufficient information to determine the plaintiff's claims had merit. *Id*. at 161. However, *King* is distinguishable from the present case. Here, unlike the situation presented in *King*, the expert report does link the alleged breaches of the standard of care to the outcome, explaining the causal relationship between the nursing staff's alleged acts and omissions and Garcia's injuries.

## CONCLUSION

After reviewing Dr. Akin's expert report, we are of the opinion it provided enough information to inform Baptist of the specific nursing conduct Garcia has called into question, and

provided a basis for the trial court to conclude that the claims against Baptist, at least at this preliminary juncture, have merit.  Thus, we hold the trial court could have reasonably concluded Dr. Akin's report represents a good faith effort to provide a fair summary on causation, and it did not abuse its discretion in denying Baptist's motion to dismiss.  Because we conclude the trial court did not abuse its discretion in denying Baptist's motion to dismiss, the trial court's order is affirmed.

Phylis J. Speedlin, Justice