Cristina **MARENTE**, Individually and as Representative of the Estate of Christian Marente, Deceased, Appellant

v.

Eunice **ASAH** and Epic Health Services, Inc., Appellees.

No. 06–15–00049–CV

Court of Appeals of Texas, Texarkana.

Submitted: January 26, 2016

Decided: March 4, 2016

Douglas T. Floyd, Attorney at Law, Piano, TX, for appellant.

David M. Walsh IV, Chamblee, Ryan, Kershaw & Anderson, Dallas, TX, Winston L. Borum, Borum & Hancock, LLP, Fort Worth, TX, for appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Moseley

In this medical negligence case, Christina Marente, individually and as representative of the estate of Christian Marente, deceased (Marente) appeals the trial court's order granting the motion to dismiss her claims against Eunice Asah, LVN, and Asah's employer, Epic Health Services, Inc. (EPIC).[1] The issue in this appeal[2] is whether the expert reports tendered on behalf of Marente by Patti Bingham, R.N., and Charles D. Marable, M.D., show that they were qualified to render an opinion on the standard of care applicable to Asah. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.402 (West 2011). After finding that neither expert was qualified, the trial court sustained the objections to both reports and dismissed Marente's claims against Asah and EPIC with prejudice.

Finding no abuse of discretion on the part of the trial court, we affirm the judgment.

## I. Factual and Procedural Background

Seventeen-year-old Christian Marente suffered from Jeune syndrome, otherwise known as asphyxiating thoracic dystrophy, which causes a small, narrow chest and variable limb shortness.[3] According to the first amended petition, Christian had respiratory complications resulting in a tracheostomy and ventilator dependency. Asah, employed by EPIC, was one of Christian's home health nurses. On September 10, 2012, Asah bathed Christian, which required disconnecting him from the ventilator. The record is unclear as to the exact mechanism, but Christian's tracheostomy tube somehow became dislodged during or after the bathing process. Although Asah "made multiple attempts to place the trachea[l] tube back into place," she was unable to do so. Asah then used a bag valve to attempt ventilation through the trachea, called 9–1–1, and performed chest compressions until emergency medical services (EMS) arrived. When EMS arrived, Christian did not have a pulse, and he was transferred to Children's Medical Center in Dallas. In the end, Christian had been pulseless for approximately ten to fifteen minutes. Having suffered significant brain damage, Christian was removed from life support on September 23, 2012.

---

**1.** Asah and EPIC have filed a joint brief. Unless otherwise indicated, they will be referred to jointly in this opinion as Asah.

**2.** These events occurred at Christian's home in Ellis County, Texas. Consequently, this case was originally appealed to the Tenth Court of Appeals, and was thereafter transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* Tex. R. App. P. 41.3.

**3.** Asphyxiating thoracic dystrophy presents respiratory symptoms which "widely vary from respiratory failure and infantile death to latent phenotype without respiratory symptoms." Chen, Harold, M.D., *Asphyxiating Thoracic Dystrophy (Jeune Syndrome) Clinical Presentation*, MEDSCAPE, http://emedicine. medscape.com/article/ 945537–overview (updated Apr. 23, 2015).

Marente sued Asah and EPIC for medical negligence resulting in Christian's death. Pursuant to Section 74.351 of the Texas Civil Practice and Remedies Code,[4] Marente timely filed expert reports from Bingham and Marable, a neurologist.[5] Asah timely objected to both reports on the basis that neither expert was qualified to render an opinion on the nursing standard of care applicable to Asah.[6] The trial court agreed with Asah, but afforded Marente thirty additional days in which to cure

4. Section 74.351(a) provides,

> In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp.2015).

5. The trial court initially concluded that Bingham's report was deficient because it failed to establish "that she possesses the qualifications necessary to set forth and identify the applicable standards of care with regard to changing the deceased Minor's trach and all related issues, and with regard to the 911 calling protocol and all related issues" and that Bingham further "statutorily lacks the qualifications to express any opinion on the ultimate issue of medical causation." With respect to Marable, the trial court initially found that his report was deficient because "it fails to establish that he possesses the qualifications necessary to set forth and identify the applicable standards of home health nursing care under the circumstances relevant to this matter, and/or Dr. Marable actually lacks the qualifications necessary to set forth and iden-

the reports' deficiencies. Within that thirty-day period, Marente served amended expert reports prepared by Bingham and Marable. Asah objected to the amended reports, still claiming that neither expert was qualified to opine on the standard of care applicable to Asah.

After a hearing on the defendants' second motion to dismiss, the trial court determined that neither expert was qualified to opine on the standard of care applicable to Asah.[7]

tify the applicable standards of home health nursing care under the circumstances relevant to this matter." The trial court further determined that "though his medical causation opinions appear sufficient, they are problematic because they are based upon ... the standard of care opinions identified by Nurse Bingham[,] who lacks the necessary qualifications to offer standard of care opinions in this matter." Marente subsequently filed amended reports drafted by both experts, which are the subject of this appeal.

6. Marente's claims against EPIC are based on its vicarious responsibility for Asah's alleged negligence.

7. The trial court's dismissal order was generic in the sense that it did not state the precise reason for the dismissal. The trial court's order reflects that it sustained Asah's and EPIC's "Objections to Plaintiff's Amended Chapter 74 Expert Reports" and, therefore, granted Asah's and EPIC's motions to dismiss. Asah and EPIC objected to Bingham's amended report, claiming that Bingham was not qualified (1) to offer standard of care opinions as to Asah and (2) to offer causation opinions as to Asah. Asah and EPIC objected to Marable's amended report, claiming that (1) Marable was not qualified to offer standard of care opinions as to Asah and (2) Marable's causation opinions fail because plaintiffs have no qualified expert to opine on standard of care. In a letter memorandum to counsel, the trial court indicated that the "overarching question" is whether Bingham and Marable are "qualified in this case to render the expert opinions presented in their reports." The trial court then focused on Section 74.402(b) as the basis for determining

## II. Standard of Review

We review a trial court's decision on a motion to dismiss under Section 74.351 for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex.2001). An abuse of discretion occurs when the trial court acts in an unreasonable or arbitrary manner without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003). A trial court will be deemed to have acted arbitrarily and unreasonably if the trial court could have reached only one decision, yet reached a different one. *See Teixeira v. Hall*, 107 S.W.3d 805, 807 (Tex.App.—Texarkana 2003, no pet.).

## III. Applicable Law and Analysis

Section 74.351(r)(5) of the Texas Civil Practice and Remedies Code provides that an "expert" in a health care liability claim is:

(B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

(C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B), (C) (West Supp.2015). Section 74.402 states the following, in pertinent part:

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial

expert qualifications. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b) (West 2011). The issue of the respective adequacy of the amended reports, therefore, depends on (1) Bingham's qualifications to · opine on the standard of care, (2) Bingham's qualifications to opine on causation, and (3) Marable's qualifications to

opine on the standard of care. The trial court recognized that Marable is qualified to opine on causation. The complaint with respect to Marable's causation opinions is limited to the issue of whether those opinions are properly supported by proper expert opinion(s) on the standard of care.

training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b), (c) (West 2011). Moreover, Section 74.402(a) describes the following as "practicing health care":

(1) training health care providers in the same field as the defendant health care provider at an accredited education institutional; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(a) (West 2011).

## A. Marente's Claims

Marente's first amended petition alleges that Asah was negligent in the following specific respects related to her care of Christian:

i. ASAH's conduct fell below nursing Standard of Care when she failed to properly care for the trach.

ii. ASAH's conduct fell below nursing Standard of Care when she failed to immediately call appropriate emergency medical assistance when the patient showed initial signs of distress.

iii. ASAH's conduct fell below nursing Standard of Care when she failed to give the 911 dispatcher the correct street address of 311 East Freeman Street.

iv. ASAH's conduct fell below nursing Standard of Care when she failed to immediately identify herself as a registered nurse resulting in unnecessary delay.

v. ASAH's conduct fell below nursing Standard of Care when she failed to properly communicate with the 911 operator.

vi. ASAH's conduct fell below nursing Standard of Care when she failed to remain calm and collected in a professional manner.

vii. ASAH's conduct fell below nursing Standard of Care when she failed to have the proper training for home health care for tracheostomy patients.

## B. Nurse Bingham's Qualifications to Render an Opinion on the Standard of Care

Bingham's curriculum vitae (CV) reflects that she is a registered nurse who currently practices as a weekend supervisor at The Courtyards Rehabilitation & Nursing Home. Her responsibilities include "overseeing all nursing care throughout the facility, monitoring vital signs, passing medications, chang[ing] dressings, trach care, conduct[ing] range of motion exercises, check[ing] the status of wounds, administer[ing] enemas[,] and start[ing] intravenous ... medications and fluids." She also works as a consultant assisting with future medical cost projections and in Medicare audit defense and Medicare appeals. In the past, Bingham has worked as a day surgery staff nurse, a hospice nurse, and as a charge nurse at Triumph Hospital Victoria. Her previous hospital duties included "monitoring patient's respiratory ventilation—tracheostomy[s], intubations, [and] pulse oximetry." Bingham's past work as a hospice nurse also included tracheostomy care. Bingham was also previously employed by Matagorda Home Health Agency, where she was, among other things, responsible for tracheostomy care. Bingham has also worked as an operating room staff nurse and an emergency room staff nurse.

Bingham described her qualifications as follows:

> I am presently a registered nurse in Texas and have been so registered for over 20 years. I have continued to use my nursing skills within those 20 years. I have worked in both the emergency room and operating room at various hospitals in Texas. I have been certified in Pediatric Advanced Life Support and Advanced Cardiac Life Support. I am qualified to care for pediatric, adolescent, and adult patients in all nursing settings.
>
> I presently work at The Courtyard Rehabilitation & Healthcare Center ... as a Registered Nurse supervisor.... My supervisory responsibilities include ... assessing the health needs of each resident. I supervise 3–4 Licensed Vocational Nurses [LVN] ... during the weekends. I oversee the care these nurses give our patients and inform the physicians and families as patient care/conditions warrant. In addition to my supervisory duties, I work with other nurses performing patient care. I monitor patients for signs of stress or difficulty breathing and perform complete, total assessments on patients. While I currently do not have tracheostomy patients at the facility, I have treated patients with tracheostomy at the nursing home many times in the past. I am personally familiar with the nursing standard of care to be delivered to patients with tracheostomies.
>
> ....
>
> .... On September 10, 2012 and at all relevant times to the present, I have practiced in the health care field of a registered nurse that involved the same type of care or treatment that Nurse Asah delivered to Christian Marente on that date. That type of care or treatment is more specifically identified below.

Asah challenges Bingham's qualifications to render the expert report because she claims that the four corners of her CV and report fail to demonstrate that she is qualified to opine on the standard of care for a home health nurse furnishing tracheostomy care to a patient like Christian "at the time" of her report in August 2013 or "at the time" of Asah's care in September 2012. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1) (establishing requirement of practicing health care in field of practice that involves same type of care or treatment as that delivered by defendant at time testimony is given or at time claim arose), § 74.351(a) (stating that analysis of expert's qualifications under Section 74.351 is limited to four corners of expert reports and CV). Although Asah acknowledges that Bingham has provided tracheostomy care at the nursing home where she is currently employed, that care is not tethered to the time of the events in this case or to the time her report was issued. We do not find any indication from Bingham's report or her CV that she was providing the same type of care delivered by Asah either at the time the report was issued or at the time the claim arose. *See Select Specialty Hosp.-Houston, Ltd. P'ship v. Simmons*, No. 01–12–00658–CV, 2013 WL 3877696, at *6 (Tex.App.—Houston [1st Dist.] July 25, 2013, no pet.) (mem.op.) (finding that expert nurse was qualified as CV demonstrated she was currently working as nurse consultant involving same type of care as that delivered by defendant); *see also Tenet Hosps. Ltd. v. Barajas*, 451 S.W.3d 535, 546 (Tex.App.—El Paso 2014, no pet.) (finding that orthopedic surgeon's CV failed to demonstrate that he was serving as consultant health care provider or training health care providers in same field at time claim arose or at time testimony was given).

Asah further contends that the tracheostomy care provided by Bingham was facility based, rather than the care Asah provided in a home health setting, thus failing to satisfy the statutory requirement that the expert must practice health care in a field of practice that involves that same *type of care* delivered by Asah. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1). At its core, this case involves a home health patient who was deprived of oxygen for a prolonged period of time when his tracheostomy tube was either inadvertently dislodged or was purposefully removed and was not timely replaced. The *type of care* at issue here necessarily centers on proper procedures for tracheostomy tube removal and timely tracheostomy tube replacement, whether the tube is dislodged or removed.[8] Logically, any qualified expert in this case should demonstrate knowledge of the standard of care in such a situation. Here, though, Bingham's report does not state how she is knowledgeable of the standard of care applicable to a home health care nurse caring for a tracheostomy patient, and nothing in her report indicates that she is familiar with the standard of care relative to the risk of tube displacement or removal, or the proper response to tube displacement and/or tube replacement. *See Rio Grande Reg'l Hosp. v. Ayala*, No. 13-11-00686-CV, 2012 WL 3637368, at *4 (Tex.App.—Corpus Christi Aug. 24, 2012, pet. denied) (mem.op.) (no challenge to expert nurse's qualifications when report demonstrated knowledge of proper standard of care for displaced or obstructed tracheostomy tube); *see also Perry v. Bradley*, No. 10-10-00402-CV, 2011 WL 6415135, at *3 (Tex.App.—Waco

Dec. 21, 2011, no pet.) (mem.op.) (clinical pharmacist and pharmacy school faculty member not qualified to opine on standard of care applicable to retail or outpatient pharmacist when nothing in report demonstrated how he was knowledgeable of the proper standard of care); *Baylor Coll. Of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex.App.—Houston [14th Dist.] 2009, no pet.) (holding that qualifications must appear in expert report and cannot be inferred); *cf. Davisson v. Nicholson*, 310 S.W.3d 543, 550-52, 553-55 (Tex.App.—Fort Worth 2010, no pet.) (discussing how contents of expert reports and CV established experts' qualifications to opine on standard of care).

Because Bingham's report and CV fail to establish that she was practicing health care in a field of practice that involves that same type of care as Asah at the time the report was written, or at the time the claim arose, and because her report and CV fail to establish knowledge of the accepted standard of care applicable to Asah, we cannot conclude that the trial court abused its discretion in finding that Bingham was not qualified. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1), (2).[9]

**C.  Marable's Qualifications to Render an Opinion on the Standard of Care**

■ Marable's CV reflects that he is a board certified neurologist with twenty-six years of experience in private practice, internships, and hospitals. In his report, Marable states that he is actively practicing medicine and was so practicing at the time the claim arose. He currently treats pediatric patients, usually over the age of

---

8.  The record does not clearly indicate whether the tube was inadvertently dislodged or was purposefully removed.

9.  A nurse cannot, as a matter of law, establish the causation prong required by Section 74.351(r)(6). *See* TEX. CIV. PRAC. & REM. CODE

ANN. §§ 74.351(r)(5)(c), 74.403(a) (West 2011); *Benish v. Grottie*, 281 S.W.3d 184, 205 (Tex.App.—Fort Worth 2009, pet. denied). Consequently, Bingham is not qualified to opine on the issue of causation. . . .

thirteen or fourteen. Marable has treated "literally hundreds of patients who have sustained hypoxic as well as anoxic encephalopathy." Marable further states that he

currently and since 1986 regularly refer[s][his] neurological patients for home health care. As a result for these referrals, I write the orders for home health care treatment for nurses and then follow up with the patient to insure that they received the prescribed care and continue to receive that care if it is ongoing. This is a very common situation in my office.

And although I am not a Registered Nurse, because of my experience since 1986 in referring patients for home health care and working with nurses that provide home health care for my patients, I am qualified to ascertain when a nurse should have adequate qualifications to treat certain illnesses in the home health care environment. I am qualified to state the standard of care for a nurse treating Christian Marente and opine on the breach of the standard of care. My experience and training in working with health care institutions such as Epic Health Services, Inc., qualify me to render an opinion as to the standard of care for such institutions and opine on the breach of the standard of care.

Marable then provided a detailed listing of the standard of care applicable to Asah.

Asah contends that Marable is not qualified to render an opinion on the standard of care as it applies to her conduct in this case because "vague interactions with home-health nurses does not mean that" he "has practice experience with the issues in this case." Asah further complains that Marable never explained that he practiced in a medical field that involved "the same type of care or treatment" provided by Asah.

Although the standard of care for a physician and for a home-health nurse may be different, a doctor is not automatically disqualified from giving opinions regarding other types of health care providers. *See Methodist Hosp. v. Shepherd–Sherman,* 296 S.W.3d 193, 198 (Tex.App.—Houston [14th Dist.] 2009, no pet.). "If the doctor is familiar with the standard of care for other health care providers based on experience working with or supervising them, then he can be qualified to render an opinion." *Id.*; *see IPH Health Care Servs., Inc. v. Ramsey,* No. 01–12–00390–CV, 2013 WL 1183307, at \*6 (Tex.App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem.op.); *Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace,* 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.). In *Simonson v. Keppard,* 225 S.W.3d 868 (Tex.App.— Dallas 2007, no pet.), the court concluded that the trial court abused its discretion when it denied a nurse practitioner's motion to dismiss. *Id.* at 874. In that case, however, the proposed physician expert failed to state in his affidavit "that he either ha[d] knowledge of the standard of care applicable to nurse practitioners or that he ha[d] ever worked with or supervised nurse practitioners." *Id.* at 872. In contrast, in the present case, Marable specifically stated that based on his experience in working with home health care nurses since 1986, he is qualified to determine "when a nurse should have adequate qualifications to treat certain illnesses in the home health care environment." He further stated, "I am qualified to state the standard of care for a nurse treating Christian Marente and opine on the breach of the standard of care."

Where "the physician states he is familiar with the standard of care" of a

nurse "for the prevention and treatment of the illness, injury, or condition involved in the claim," that physician is qualified on the issue of whether the nurse departed from the accepted standards of care for health care providers. *Wallace,* 278 S.W.3d at 558;[10] *see San Jacinto Methodist Hosp. v. Bennett,* 256 S.W.3d 806, 814 (Tex.App.—Houston [14th Dist.] 2008, no pet.); *Children's Med. Ctr. of Dallas v. Durham,* 402 S.W.3d 391, 399 (Tex.App.—Dallas 2013, no pet.). As in *Wallace,* Marable's report includes his specific statement that he has worked with home health care nurses for many years and he is familiar with the standards of care that apply to home health nurses.

A closer look at the foregoing cases indicates, however, that each of the experts provided specific statements regarding the care and treatment of the condition involved in the claim. For example, in *Bennett,* the physician stated that he had two certifications that directly addressed "the subject matter of this clam, as the claim relates to management of decubitus ulcers." *Bennett,* 256 S.W.3d at 813. The expert further stated that

> he had either trained, served as a consultant to, or observed health care providers in the same fields as the defendants [and that] he has knowledge of the accepted standards of medical care for the diagnosis, care, and treatment related to the prevention and management of *decubitus ulcers.* He further stated he is "familiar with the standard of care for both nurses and physicians for the prevention and treatment of *decubitus ulcers.*" Finally, Dr. Hammond explained, "I give direct care to patients with *decubitus ulcers* and was doing so at all

times relevant to this case. As such, I am also familiar with the consequences of improper management of *decubitus ulcers* that is not within the standard of care."

*Id.* (emphasis added). Because the report provided detailed information explaining the basis of the expert's knowledge of the standard of care relating to treatment of the type of condition involved, the expert was qualified.

In *Wallace,* the condition involved in the claim was cerebrovascular disease. The expert report stated the expert's qualifications on the

> issue of whether the nurses, nurse practitioner, physician's assistant, and physician involved in the claim departed from accepted standards of medical care. In addition to the statements in his report, Dr. Busby's curriculum vitae states he is certified by the American Board of Psychiatry and Neurology, he has practiced general and clinical neurology, and his patient care responsibilities at the University of Texas Medical Branch at Galveston include the evaluation and care management of adult and adolescent neurology patients in the inpatient and outpatient settings and critical care management in the ICU and ER settings with a specific interest in *cerebrovascular disease.*

*Wallace,* 278 S.W.3d at 558 (emphasis added). Because the expert's report stated that the expert "worked with nurses, nurse practitioners, physician's assistants, and physicians, including emergency room physicians, and he is familiar with the standards of care that apply to such health

---

10. In *Wallace,* the Dallas court affirmed the trial court's denial of Baylor Medical Center's motion to dismiss. In that case, Baylor complained that although the expert's "report and curriculum vitae may arguably establish

training, experience, or knowledge of the care expected from an emergency room physician, nothing shows he is familiar with the specific issues to these various specialty health care providers." *Wallace,* 278 S.W.3d at 557.

care providers in *similar situations*," the expert was qualified to opine on the standard of care. *Id.* at 559 (emphasis added).

In *Durham*, the expert physician was qualified to opine as to the standard of care for a nurse practitioner. There, the condition at issue was an aortic rupture following a car accident. *Durham*, 402 S.W.3d at 393. The expert was asked to provide opinions regarding the medical care the patient received at a hospital to which she had been transferred. The expert discussed his qualifications to speak to the standard of care for a nurse practitioner and stated that "he routinely interacts with nurse practitioners in a hospital setting, has supervised nurse practitioners in that setting, and 'presently, and in the past, [has] served as a training and supervising preceptor for nurse practitioners in the clinical setting.'" *Id.* at 397. The expert further described the basis for his knowledge of the appropriate standard of care:

> I have also interacted as a physician in the setting of a hospital, where ... nurse practitioners have been called upon to evaluate a patient who has complex medical issues or who has encountered a significant medical finding outside of his or her area of practice, and in each of these contexts, and because of my experience in each, I am familiar with the standard of care applicable to their clinical responsibilities in reporting and/or managing such conditions.

*Id.* at 397. Because the expert report stated that he had worked with nurse practitioners and was familiar with the standards of care that apply to nurse practitioners in *similar situations*, the expert was qualified to opine on the nurse practitioner's standard of care. *Id.* at 399.

The Waco court addressed the issue of a physician's expert qualifications in *Hillcrest Baptist Medical Center v. Payne*, No.

10–11–00191–CV, 2011 WL 5830469 (Tex. App.—Waco Nov. 16, 2011, pet. denied) (mem.op.). There, the condition at issue was the care and treatment of pressure ulcers. The expert report indicated that the expert had experience in caring for patients with pressure ulcers and in supervising nurses providing such care:

> I have experience in caring for patients with *pressure ulcers*. I write nursing orders to the nurses caring for patients with *pressure ulcers*. I, therefore, have experience in supervising nurses with regard to the carrying out of my orders. I also know when a nurse has not followed my orders. I have cared for numerous hospitalized patients who have developed *pressure ulcers*. I have cared for numerous hospitalized patients who were at risk for developing *pressure ulcers* [,] and I have managed a hospitalized patient's treatment of or the prevention of *pressure ulcers*. Throughout my entire medical career, I have supervised nurses in the care, treatment[,] and prevention of hospitalized patients who are at risk for or have *pressure ulcers*. The standard of care is the same for nurses and physicians in regard to the care, treatment[,] and/or prevention of *pressure ulcers* regardless of where the patient is, i.e.[,] a hospital or a nursing home. The standard of care for the prevention of and treatment of *pressure ulcers* is the same for nurses as it is for physicians: the patient should be turned every two hours, the area at risk should be kept clean and dry, and the skin should be carefully monitored.

*Id.* at *6 (emphasis added). While this case involved a challenge to the expert's qualifications to opine on causation, the court recognized that when

> the physician states he is familiar with the standard of care for both nurses and physicians, and for the prevention and

treatment of the illness, injury, or condition *involved in the claim,* the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers.

*Id.* at *5 (emphasis added). The report demonstrates the expert's familiarity with the standard of care for a nurse treating a pressure ulcer.

In *Leonard v. Glenn,* 293 S.W.3d 669, 676 (Tex.App.—San Antonio 2009), *rev'd on other grounds,* 332 S.W.3d 403 (2011), the relevant claim was the alleged negligent prescription of indomethacin for an individual with renal disease that was documented in the medical records, which allegedly resulted in renal failure. *Id.* at 678. In addition to the fact that the expert's report reflected extensive credentials in the field of nephrology, the expert was "the author or coauthor of a number of articles relating to *renal failure* and attendant complications." *Id.* at 676 (emphasis added). The expert additionally detailed the "well known result of prescribing [i]ndomethacin to individuals to whom such medication is contraindicated." *Id.* Because the report demonstrated the expert's knowledge of the standard of care, the expert was qualified to render an opinion regarding the standard of care provided by the defendant physician. *Id.* at 678. And, although the report failed to establish the expert's experience in supervising a physician assistant, because "the expert reports are not based on and do not criticize Dr. Hain for the failure to adequately supervise her physician assistant," a demonstration of such knowledge was not required. *Id.*

In *Navarro Hospital, L.P. v. Washington,* No. 10–13–00248–CV, 2014 WL 1882763 (Tex.App.—Waco May 8, 2014, pet. denied) (mem.op.), the claim involved a patient that required advanced airway management and equipment in response to a "Code Blue." *Id.* at *1. The hospital challenged the expert's qualifications to render an opinion on the standard of care applicable to the hospital. *Id.* at *5. The expert's report demonstrated, however, that he had expertise in critical-care and emergency medicine, "especially with regard to airway management and responding to Code Blue situations—the type of expertise involved in the claims asserted in this case." *Id.* at *5. The report further indicated that the expert was familiar with "the medical treatment of a patient similarly situated" to the involved patient and that he was "familiar with the actions and equipment necessary for the advanced airway management" involved in the case. *Id.* Consequently, the expert was qualified to opine on the appropriate standard of care. *Id.*

Here, the trial court found that Marable was not qualified to opine on the standard of nursing care applicable to Asah. Given the relatively broad language in the caselaw, when read in light of the specific, detailed statements made in the expert reports aforementioned, the question of whether Marable was qualified was a close call. The trial court was apparently troubled by the fact that Marable did not include sufficient detail in his report stating the basis of his knowledge of the appropriate standard of care. The report did not state that Marable was experienced in treating patients with tracheostomy tubes, nor did it indicate that he had ever supervised nurses or worked with nurses who cared for patients with tracheostomy tubes, as in this case. Arguably, the report therefore does not include sufficient detail demonstrating Marable's qualifications to opine on the nursing standard of care applicable to Asah in this case. *See Clark v. HCA, Inc.,* 210 S.W.3d 1, 7–8 (Tex.App.—El Paso 2005, no pet.)

(concluding that trial court did not abuse its discretion when it found plaintiff's expert not qualified because record did not indicate doctor's current role in relevant field or his experience with anticoagulation therapy at issue); *In re Windisch,* 138 S.W.3d 507, 514 (Tex.App.—Amarillo 2004, no pet.) (per curiam) (finding expert report inadequate for statutory purposes because report failed to indicate experience which could "reasonably be said to demonstrate that he has knowledge of the accepted standard of care for the procedure" at issue).

We acknowledge that the issue of whether Marable's report demonstrates sufficient qualifications to permit him to opine on the nursing standard of care for the type of care rendered in this case is a close call. "Close calls must go to the trial court." *Larson v. Downing,* 197 S.W.3d 303, 304 (Tex.2006) (per curiam) (upholding trial court's decision to strike expert testimony of physician because he was not qualified as expert).

We affirm the judgment of the trial court.