

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00248-CV

———————————————

COOK CHILDREN'S MEDICAL CENTER AND COOK CHILDREN'S HEALTH
CARE SYSTEM -AND- COOK CHILDREN'S PHYSICIAN NETWORK AND
JOSE OLARTE-MOTTA, M.D., Appellants

V.

C.R. AND A.B., INDIVIDUALLY AND AS NATURAL GUARDIANS AND NEXT
FRIENDS OF G.R., A MINOR, Appellees

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-293532-17

Before Gabriel, Pittman, and Bassel, JJ.
Memorandum Opinion by Justice Pittman

## MEMORANDUM OPINION

In this accelerated interlocutory appeal, Appellants Cook Children's Medical Center (CCMC) and Cook Children's Health Care System (the System) (collectively, the Hospital) and Appellants Cook Children's Physician Network (the Network) and Jose Olarte-Motta, M.D.[1] appeal from the trial court's denial of their motions to dismiss the healthcare liability claims filed against them by Appellees C.R. and A.B., Individually and as Natural Guardians and Next Friends of G.R., a Minor. Because we hold that C.R. and A.B.'s expert report satisfies the statutory requirements, we affirm.

## BACKGROUND

### I. G.R. Develops Brain Injury at CCMC.

In July 2017, G.R.'s father, C.R., and mother, A.B. (Parents), sued the Medical Defendants after G.R. suffered permanent injury to her brain while a patient in the Hospital's pediatric intensive care unit (PICU). Parents' live pleadings alleged the following facts.

On May 10, 2015, Parents took G.R. to the Hospital after she fell head-first into a bucket that held a cleaning solution containing bleach. The Hospital admitted G.R. and performed a diagnostic procedure that revealed mild irritation of her

---

[1]We will refer to all four Appellants collectively as "the Medical Defendants."

stomach and esophagus.  By May 12th, she had some vomiting but was eating and drinking satisfactorily, and so the Hospital discharged her.

On May 15th, because G.R. was experiencing increased vomiting and diarrhea and decreased eating and drinking, Parents took her to the Hospital's emergency department.  She was admitted to the general pediatric ward, where she was able to eat and drink satisfactorily but continued to vomit intermittently.

On May 20th, she had an episode thought to be a seizure.  She improved with ventilation, was administered medication to stop the seizure, and was admitted to the PICU.  She continued to have seizure-like activity between May 23rd and May 24th, for which she was treated with medication.  Just after midnight on May 25th, G.R. had an unplanned extubation[2] or dislodgement of her endotracheal tube.  She was given oxygen via a nasal cannula until 5:20 p.m., at which time she was reintubated with an endotracheal tube and started on a different seizure medication.

---

[2]Endotracheal intubation is the placement of a flexible plastic tube into the trachea, "either orally or nasally[,] for airway management."  Yeliz Şahiner, *Indications for Endotracheal Intubation, in* Tracheal Intubation, 59, 59–60 (Rıza Hakan Erbay ed., 2018), *available at* http://dx.doi.org/10.5772/intechopen.76172 (last visited Feb. 26, 2019).  The endotracheal tube forms an open passage in the upper airways, and the tube is connected to a mechanical ventilator to provide continuous respiration to the patient. *Id.*  Unplanned extubation occurs when an endotracheal tube is accidentally removed or is removed by a patient.  Tae Won Lee, et al., *Unplanned Extubation in Patients with Mechanical Ventilation:  Experience in the Med. Intensive Care Unit of a Single Tertiary Hosp.*, 78 Tuberculosis & Respiratory Diseases 336, 336 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4620326 (last visited Feb. 26, 2019).

G.R.'s vital signs were normal when measured at 9:00 p.m. on May 25th. At the next recorded measurement of her vital signs at 9:40 p.m., her heart rate and oxygen saturation were dangerously low. A measurement of her exhalation carbon dioxide level suggested that her endotracheal tube had again become extubated or dislodged, so it was removed, and she was given mask bagged ventilation. G.R. was given atropine and epinephrine for her heart, but it was unsuccessful, and CPR was administered. After multiple rounds of epinephrine and CPR, her spontaneous circulation returned. She was reintubated and a hypothermia protocol (used to reduce brain injury from oxygen deprivation[3]) was initiated. At 10:05 pm, her vital signs returned to satisfactory levels. However, because of the oxygen deprivation, G.R. developed hypoxic/ischemic encephalopathy.[4]

---

[3]*See* Shlee S. Song, M.D. & Patrick D. Lyden, M.D., FAAN, FAHA, *Overview of Therapeutic Hypothermia*, Current Treatment Options in Neurology, Dec. 2012, at 1 (stating that therapeutic hypothermia "improves neurological recovery and reduces mortality after global ischemia, such as in patients with cardiac arrest, and in infants with moderate or severe hypoxic-ischemic encephalopathy"), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3519955/pdf/nihms-410186.pdf (last visited Feb. 26, 2019).

[4]"Encephalopathy refers to 'any degenerative disease of the brain.'" *Anderson v. Sec'y of Health & Human Servs.*, 131 Fed. Cl. 735, 739 n.9 (2017) (quoting Dorland's Illustrated Med. Dictionary 614 (32d ed. 2012)). Hypoxic-ischemic encephalopathy "is defined as an 'encephalopathy resulting from asphyxia.'" *Thomas v. Sec'y of Dept. of Health & Human Servs.*, No. 01-645V, 2007 WL 470410, at *10 n.10 (Fed. Cl. Jan. 23, 2007) (quoting Dorland's Illustrated Med. Dictionary 611 (30th ed. 2003)).

**II.     The Medical Defendants Move for Dismissal.**

Parents served the Medical Defendants with the expert report of Dr. Bruce Greenwald, chief of Pediatric Critical Care Medicine at Weill Cornell Medical College and the Director of the Pediatric Intensive Care Unit at New York Presbyterian Hospital-Weill Cornell Medical Center.  Dr. Olarte-Motta and Network moved to dismiss Parents' claims, objecting that the initial report was inadequate with respect to standard of care, breach, and causation.  The Hospital also filed objections and moved to dismiss.  The Hospital raised the same objections as Dr. Olarte-Motta and the Network and further objected that the report did not establish that Dr. Greenwald was qualified to render standard of care opinions regarding the nursing staff and non-physician personnel of the Hospital.

Parents filed a supplemental expert report in the form of an affidavit from Dr. Greenwald.  After further objections from the Medical Defendants and a hearing before the trial court, Parents filed a second supplemental expert report (the Report) from Dr. Greenwald, to which the Medical Defendants also objected.  The trial court denied the Medical Defendants' motions to dismiss, and they now appeal.

## EXPERT REPORT REQUIREMENTS UNDER TEXAS CIVIL PRACTICE AND REMEDIES CODE SECTION 74.351

A claimant asserting a health care liability claim is required to serve each defendant with one or more expert reports meeting the requirements set out in Texas Civil Practice and Remedies Code section 74.351.  Tex. Civ. Prac. & Rem. Code Ann.

5

§ 74.351. Both the standards for such reports and the standard by which we review a trial court's ruling on a motion to dismiss a claim for failure to file a compliant report are well-established. *See id.* § 74.351(a), (b), (r)(6); *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018).

## DISCUSSION

### I. The Report is Sufficient as to the Challenged Elements.

#### A. Expert Reports Have Three Essential Elements.

The Medical Defendants challenge the Report as to each of the required statutory elements—(A) the stated standards of care, (B) the alleged failure of each health care provider to meet them, and (C) the causal relationship between that failure and the injury claimed. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 457 (Tex. 2017) (setting out the required parts of an expert report); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) ("'Expert report' means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."). "For the purposes of a statutory expert report, statements concerning the standard of care and breach need **only** identify what care was expected and was not given with such specificity that inferences need not be indulged to discern them." *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 270 (Tex. App.—Fort Worth

6

2009, no pet.) (emphasis added); *see also Baty*, 543 S.W.3d at 697 (reasoning that expert report was sufficient because it states a specific action the doctor was supposed to avoid doing and what he should have done instead); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001) (stating that a fair summary of the standard of care sets out what care was expected).

The causation element requires the expert report to "explain 'how and why' the alleged negligence caused the injury in question." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224 (Tex. 2018). "A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts." *Id.*

The Supreme Court of Texas has provided instructive guidance explaining how an expert report satisfies the causation requirement:

> While the plaintiff is not required to prove her claim with the expert report, the report must show that a qualified expert is of the opinion she can. . . . In showing how and why a breach of the standard of care caused injury, the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven:
>
>> Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred.
>
> This is the causal relationship between breach and injury that an expert report must explain to satisfy the Act.

7

*Zamarripa*, 526 S.W.3d at 460 (citation omitted).

Accordingly, for the Report to satisfy statutory requirements, Dr. Greenwald was required to explain, factually, how the breach of the standard of care was a substantial factor in bringing about the harm and that absent that breach, the harm would not have occurred. *See id.* "In satisfying this 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Abshire*, 563 S.W.3d at 224. "[A]n expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013). For the reasons set forth in detail below, we hold that the Report is compliant with the statutory requirements enumerated in section 74.351 of the Texas Civil Practice and Remedies Code.

## B. The Report Contains the Three Required Elements.

In the Report, Dr. Greenwald opined that the doctors, nurses, and other PICU members are all responsible for monitoring their PICU patients continuously, so that if a patient's oxygenation levels and other vital signs drop, the PICU staff can assess the patient and, if the patient has a dislodged or extubated endotracheal tube or otherwise has problems with loss of the airway, reestablish the airway within two to three minutes. The timing is crucial because the patient will begin to suffer brain damage after three minutes. That brain injury can occur so quickly is part of the

8

reason that all members of the PICU team have the duty to monitor PICU patients constantly. The PICU staff must work as a team to ensure that no patient is unmonitored; if one staff member cannot attend to their patients, another PICU member must cover for that person until they can resume their regular duties.

Dr. Greenwald also opined that the on-call physician of the PICU has the additional duty of overseeing the PICU and directing PICU staff to monitor the patients to ensure that patients are continuously monitored. The physician must ensure that staff are following policies and procedures charting patients' progress and that there are no delays in any needed resuscitation efforts or in calling the code team if necessary.

Dr. Greenwald further opined that in this case, the PICU team, including its nurses and Dr. Olarte-Motta, failed to meet that standard; the records indicate that she was not adequately monitored, and the PICU team did not respond fast enough when G.R. began suffering from deoxygenation and therefore did not reestablish an airway within the two-to-three-minute window. And because of the PICU team's failure to promptly act and reestablish an airway, G.R. was without oxygen for at least ten minutes, which caused her to suffer permanent, serious brain injury. We hold that the Report adequately describes what care was expected and was not given and how that failure caused G.R.'s brain injury.

## C. The Medical Defendant's Complaints are Unavailing.

### 1. The Report is Adequate as to Standard of Care.

Each of the Medical Defendants submits a bevy of challenges to Dr. Greenwald's opinion of the applicable standard of care in the Report. First, Dr. Olarte-Motta challenges the Report's standard of care as conclusory. He contends that Dr. Greenwald failed to explain what steps a physician should take to ensure that staff are following policies and procedures, monitoring and charting patients' progress, available to respond within two to three minutes in emergent situations, and that there are no delays in resuscitation efforts or in calling the code team if an emergent situation occurs.

However, the Report is sufficient as to a standard of care element for Dr. Olarte-Motta. Aside from ascribing to Dr. Olarte-Motta the responsibility to ensure that PICU staff are performing their described duties, Dr. Greenwald also stated that Dr. Olarte-Motta, like all members of the PICU team, has a duty to monitor the respiratory status and vital signs of PICU patients so that oxygenation can be restored within two to three minutes of an emergent event. Thus, while Dr. Olarte-Motta asserts that the Report does not explain how he can make sure oxygen desaturation is detected and corrected within two to three minutes, the Report explains the detection and correction is accomplished by the constant monitoring required by the standard of care. Thus, the doctor in charge of a PICU must monitor patients' vital signs and oxygenation levels. If the doctor is unavailable to monitor the patients, he must make

10

sure that another PICU team member is doing so, and he must direct the PICU team members to do so.

Second, the System argues that the Report does not set out a standard of care, breach, and causation applicable to it. The System's assertion is correct but not determinative of whether its motion to dismiss should have been granted. Parents' claims against the System are based on vicarious liability for the acts of the PICU's nurses and staff, who Parents alleged were agents, employees, or servants of CCMC and the System. Accordingly, this challenge fails because the Report did not need to address the System's own breach of a standard of care in order for the claims against it to proceed. *See id.* (holding that "when a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory").

Third, the Hospital argues that it and its patients' attending physicians "are separate health care providers and played distinct roles in G.R.'s treatment[] and the decisions with respect to the care and treatment provided" and that "Dr. Greenwald fails to differentiate between the two, or to otherwise explain how and why the

standard he seeks to impose on all of the defendants, collectively, is 'universal.'"[5] This argument is without merit.

Dr. Greenwald does not assign the exact same standard of care to all treatment providers, but he does assert that all the Medical Defendants had a duty to continuously monitor PICU patients for changes in their vital signs and oxygenation levels and to intervene to reestablish oxygenation within two to three minutes of a patient's unplanned extubation or other loss of an airway. His doing so does not make the Report inadequate. *Cf. In re Stacy K. Boone, P.A.*, 223 S.W.3d 398, 406 (Tex. App.—Amarillo 2006) (orig. proceeding) (holding that expert report adequately set out a standard of care for each defendant despite ascribing the same standard of care for each defendant). Indeed, Dr. Greenwald explained as follows why all PICU team members' respective standards of care include these duties:

> Maintaining an airway and oxygenation to a pediatric patient is the most important function of a PICU as failure to do so or [a] delay in doing so will result in severe injury or death to the patient. Severe hypoxic/ischemic injury to the brain occurs when the brain is deprived of oxygen. Brain cells are extremely sensitive to oxygen deprivation and damage can occur after three minutes and the brain cells can begin to die within five minutes after oxygen supply has been compromised. Hypoxic/ischemic injury to the brain can be caused by any event that severely interferes with the brain's ability to receive or process oxygen.
>
> It is my expert opinion that a PICU pediatric patient on assisted ventilation such as G.R. who is being treated in a PICU such as

---

[5]The Hospital asserts this argument in the section of its brief challenging Dr. Greenwald's qualifications, but we address it here because it relates to the standard of care.

[Hospital]'s PICU and who suffers a[] misplaced or plugged endotracheal tube or unplanned extubation/dislodgment of the endotracheal tube is in immediate danger of respiratory failure and catastrophic neurological damage or death if oxygenation and ventilation are not reestablished within 2–3 minutes.

We reject the Hospital's argument that Dr. Greenwald's report is inadequate because it ascribes many of the same duties to each of the Medical Defendants. And we note that whether the Medical Defendants believe the standards of care in the Report are reasonable is not relevant to the analysis of whether his opinion constitutes a good-faith effort to meet the statute's requirements. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516–17 (Tex. 2017). The Hospital's challenges to the Report with regards to the standard of care are premature at this stage of the litigation.

## 2. The Report is Adequate as to Breach.

Next, Dr. Olarte-Motta and the Network assert that the Report is inadequate as to breach of the applicable standard of care because it "states nothing specific about what Dr. Olarte-Motta did or did not do in connection with [G.R.]'s care and treatment and it says nothing about what Dr. Olarte-Motta should have done differently to show he breached some applicable standard of care." We disagree. The Report plainly asserts that Dr. Olarte-Motta should have but failed to, among other things, keep an eye on G.R.'s vital signs, direct other PICU team members to continuously monitor her as well, notice G.R.'s lack of oxygen, timely reestablish an airway, and timely call the code team to begin CPR.

13

Dr. Olarte-Motta and the Network then challenge as conclusory the Report's statement that G.R. and her vital signs and respiratory condition were not monitored between 9:00 p.m. and 9:40 p.m. They argue that the Report notes that after the event, Dr. Javier Gelvez[6] reviewed end tidal $CO_2$ data from before and during the event, which they argue means that her vital signs and oxygenation levels had to have been monitored to produce the data that he reviewed. The note from Dr. Gelvez included in the Report, however—that he "review[ed] monitor EtC02 decreased progressively indicating a decrease in cardiac output"—did not indicate what time "before" the event this data was taken. And importantly, Dr. Gelvez's note contains no indication that any PICU team member was reviewing and responding to the data produced by the equipment monitoring G.R.'s vital signs and oxygenation level.

Dr. Olarte-Motta and the Network point to the note of Nurse May, purportedly written at 9:45 p.m., stating that G.R. had experienced a desaturation episode, prompting a nurse to start "bagging" G.R., and that she was reintubated. They contend that this note indicates that G.R. had been reintubated by 9:45 p.m., contradicting the Report's statement that G.R. was without oxygen between 9:00 p.m. and 9:40 p.m. However, taking the nurse's note as true, it does not contradict the Report's assertion that G.R. was not monitored properly or that her airway was not

---

[6]The Report's context suggests that Dr. Gelvez is employed by or affiliated with the Hospital, but the Report does not explain his role or why he reviewed the records.

14

reestablished within the two-to-three-minute window. The Report states that based on the extent of the brain injury, in Dr. Greenwald's opinion G.R. was without sufficient oxygen for at least ten minutes. And nothing in the Report contradicts its assertion that after 9:00 p.m. the medical records show no notation of G.R.'s vital signs, including a decline in oxygenation levels, until they had reached dangerously low levels.

The Hospital challenges the Report's adequacy as to the breach of standard of care by contending that although the Report "states that the patient lost her airway between 9:00 p.m. and 9:40 p.m., this ignores the note of Dr. Olarte-Motta," which states that G.R.'s oxygen saturation and heart rate dropped at 9:40 p.m., and that "Dr. Greenwald's conclusion . . . does not include facts to support the timeline he provides. Instead of relying on notes made in the chart by the physician, he focuses on how vital signs were not documented between that time." The Hospital asserts that "[t]his conclusion makes the assumption that because the vital signs are not documented during that time, it means the patient had abnormal vital signs," and it argues that this conclusion is improper and that Dr. Greenwald fails to provide facts to support it. In other words, the Hospital asserts that the Report is conclusory because it does not set out a proper basis for Dr. Greenwald's conclusion about the Hospital's breach. *See Windrum v. Kareh*, No. 17-0328, 2019 WL 321925, at *3–4 (Tex. Jan. 25, 2019) (stating that "[a] conclusory statement asserts a conclusion with no basis or explanation" and that an expert's opinion is conclusory when the expert

15

(1) asks the fact finder to take his or her word that the opinion is correct, but either the expert offers no basis for the opinion or the bases offered do not actually support the opinion, or (2) offers only his or her word that the bases offered to support the opinion actually exist or support the opinion). Again, we must disagree with the Hospital.

Dr. Greenwald opined that because G.R. suffered a cardiac arrest and suffered "catastrophic neurological damage," in his expert opinion, she was without an airway or oxygenation for over ten minutes. Thus, he opined that regardless of whether the PICU staff checked G.R.'s vital signs and oxygenation at *some* point between 9:00 p.m. and 9:45 p.m., and regardless of Dr. Olarte-Motta's note that staff recognized a problem at 9:40 p.m., G.R. went long enough without anyone noticing that she was without oxygen, and without anyone reestablishing an airway, that the time for which she was not monitored and before PICU staff moved to reestablish an airway well exceeded the two to three minutes maximum that Dr. Greenwald asserted was the standard of care. Simply put, Dr. Greenwald's statements of a breach of a standard of care were not conclusory.

### 3. The Report is Adequate as to Causation.

The Hospital next challenges the adequacy of the Report as to Dr. Greenwald's opinion as to causation. Specifically, it asserts that "there cannot be a causal connection between any breach and [G.R.'s] injuries because the Report does not show the incident upon which [Parents]' claims are based occurred." The Hospital's

argument is based on the Report's mention of an alternative opinion, given by Dr. Gelvez, about what happened on the evening of May 25th. The Hospital asserts that the Report notes that after reviewing data, Dr. Gelvez concluded that the event was caused by a cardiac episode, not by a mechanical problem with the endotracheal tube. However, the Report does address this alternative explanation. Dr. Greenwald notes that a review by pediatric cardiologist Deborah Schutte concluded that G.R. initially had a declining end tidal $CO_2$ but a stable heart rate—seeming to contradict Dr. Gelvez's[7] conclusion that the cardiac issue came first—and she stated, "Based on history, her EKG, her echocardiograms, and review of the monitor, I do not feel this was a primary cardiac event." Dr. Greenwald agreed with this assessment—that G.R.'s drop in oxygenation level preceded rather than was caused by a cardiac event— and he opined that because G.R. suffered the kind of brain injury that she did, she had to have been without oxygen for at least ten minutes.

Dr. Greenwald explained that in his opinion, G.R.'s undetected deoxygenation led to the cardiac event; that based upon the fact that she suffered a cardiac arrest and catastrophic neurological damage, it is his expert opinion that G.R. was without an airway or oxygenation for over ten minutes; and that her vital signs, including oxygenation levels, were not adequately monitored between 9:00 p.m. and 9:40 p.m. in order for PICU staff to become aware of the issue and reestablish an airway within

---

[7]The Report notes that Dr. Schutte is a pediatric cardiologist, but it does not indicate the specialty of Dr. Gelvez.

17

two to three minutes of the loss of the airway. The Report therefore adequately explains the "how and why" the Medical Defendants' breaches caused G.R.'s brain injury; his report "make[s] a good faith effort to explain, factually, how proximate cause is going to be proven." *Miller*, 536 S.W.3d at 515 (quoting *Zamarripa*, 526 S.W.3d at 460).

Dr. Greenwald's report provided enough information to inform the Medical Defendants of the conduct called into question and to allow the trial court to conclude that Parents' claims have merit. *See id.* at 517. Further, his opinion addresses Dr. Gelvez's alternative conclusion that there was no airway problem that caused G.R.'s cardiac event. Despite the Hospital's arguments, whether Dr. Greenwald or Dr. Gelvez is correct is not an issue the trial court could address at this initial stage of the litigation, and neither can we. *See Baty*, 543 S.W.3d at 697 (stating that "[t]he parties to a medical-malpractice case may—and often do—disagree over what the standard of care in fact requires," and that because the expert's report "identifies the 'conduct being called into question' . . . and provides the trial court a basis to conclude [the plaintiff's] claims have merit, it satisfies the good-faith effort the statute requires").

We overrule Dr. Olarte-Motta and the Network's issue and this part of the Hospital's first issue.

**II.    Dr. Greenwald is Qualified to Render Standard of Care Opinions Regarding Hospital and Its Staff.**

As part of its first issue, the Hospital additionally asserts that the Report does not establish Dr. Greenwald's qualification to offer standard of care opinions for the Hospital's non-physician staff.  It contends that while Dr. Greenwald certainly may be familiar with the applicable standards for hospitals and nurses, he failed to establish that he is qualified to opine on them.

The Dallas Court of Appeals has succinctly explained how physicians establish their qualifications to provide expert reports for claims against non-physicians.

> When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers.

*Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.).  However, a physician qualifies as an expert on the issue of a physician's or nurse's departure from the accepted standards of care if the physician states he is familiar with the standard of care for both nurses and physicians, and for the prevention and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers.  *Id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1)–(3).  And, if a physician

19

states he is familiar with the standard of care and responsibilities and requirements for the non-physician health care provider defendant—in *Wallace*, nurses and physician's assistants—and he has worked with, interacted with, and supervised that category of non-physician health care provider, the physician is qualified to opine on the issue of whether the health care provider departed from the accepted standards of care for health care providers. *Wallace*, 278 S.W.3d at 558.

Here, Dr. Greenwald included the following information in the Report:

- He has a clinical practice in pediatric critical care medicine at Weill Cornell Medicine, New York Presbyterian Hospital–Cornell Medical Center and is the Chief, Division of Pediatric Care Medicine and the Executive Vice Chairman of the Department of Pediatrics at Weill Cornell Medicine;

- He evaluates and treats critically ill or injured pediatric patients, including pediatric patients who ingested bleach and other caustic substances; who suffer oxygen desaturation episodes resulting from illness, diseases, or injuries such as G.R.'s; who are suffering respiratory distress and are receiving oxygenation; and who have suffered hypoxic neurological injury;

- Based on his education, knowledge, skill, training, and experience, he is familiar with the following: (1) the minimum standard of care required of physicians, hospitals, and nurses regarding pediatric critical care procedures and protocol for pediatric patients receiving care and treatment in a PICU, including care and treatment while receiving continuous oxygen by mask or by endotracheal tube; (2) the minimum standard of care required of PICU physicians, hospitals, nurses, and medical personnel treating a pediatric patient receiving continuous oxygen or who has suffered oxygen desaturation episodes that have not resolved; and (3) the proper course of action to be taken by such PICU physicians, hospitals, nurses, and medical personnel in the monitoring, timely care, and treatment of a pediatric patient who is receiving oxygen by endotracheal tube and whose endotracheal tube becomes extubated, dislodged, or obstructed or who is otherwise not receiving the proper oxygenation to prevent asphyxia or hypoxic neurological injury and cardiac arrest;

- He has served on the following committees at New York Presbyterian Hospital: Pediatric Critical Care Quality Assurance (chair); Pediatric Intensive Care Unit (chair); Pediatric Quality Assurance/Significant Events (vice chair); Pediatric Operations (chair); and Pediatric Error Reduction; and

- He has served as the director of a PICU, and the physician acting as the director and chief of the PICU has the duty to direct and oversee the operations of the PICU and to ensure that PICU nurses and its staff are performing duties he describes in the Report.

Further, Dr. Greenwald articulated the standard of care for PICU nurses and staff. From our review of the Report, Dr. Greenwald showed that he is qualified to opine on the standard of care applicable to the Hospital and its nurses and non-physician staff. *See id.*

We overrule the remainder of the Hospital's first issue.

## III. The Trial Court Correctly Denied Attorney's Fees for the Hospital.

In its second issue, the Hospital argues that the trial court erred in failing to award it attorney's fees as a sanction for Parents' failure to tender an expert report. Because we have held that the Report satisfies the statutory requirement to file an expert report, *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (*l*), we overrule the Hospital's second issue.

## CONCLUSION

Having overruled the Medical Defendants' issues, we affirm the trial court's denial of the motions to dismiss.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Delivered:  March 14, 2019